362 So.2d 160 (1978)
Michael J. SATZ, State Attorney for Broward County, Florida, Appellant,
v.
Abe PERLMUTTER, Appellee.
No. 78-1486.
District Court of Appeal of Florida, Fourth District.
September 13, 1978.
Rehearing Denied September 27, 1978.
*161 Robert L. Shevin, Atty. Gen., Tallahassee, and Charles W. Musgrove, Asst. Atty. Gen., West Palm Beach, for appellant.
David A. Hoines, Fort Lauderdale, for appellee Abe Perlmutter.
Walter G. Campbell, Jr., of Law Offices Krupnick & Campbell, P.A., Fort Lauderdale, for appellee Nelson Liss, M.D.
LETTS, Judge.
The State here appeals a trial court order permitting the removal of an artificial life sustaining device from a competent, but terminally ill adult. We affirm.
Seventy-three year old Abe Perlmutter lies mortally sick in a hospital, suffering from amyotrophic lateral sclerosis (Lou Gehrig's disease) diagnosed in January 1977. There is no cure and normal life expectancy, from time of diagnosis, is but two years. In Mr. Perlmutter, the affliction has progressed to the point of virtual incapability of movement, inability to breathe without a mechanical respirator and his very speech is an extreme effort. Even with the respirator, the prognosis is death within a short time. Notwithstanding, he remains in command of his mental faculties and legally competent. He seeks, with full approval of his adult family, to have the respirator removed from his trachea, which act, according to his physician, based upon medical probability, would result in "a reasonable life expectancy of less than one hour". Mr. Perlmutter is fully aware of the inevitable result of such removal, yet has attempted to remove it for himself (hospital personnel, activated by an alarm, reconnected it). He has repeatedly stated to his family, "I'm miserable take it out" and at a bedside hearing, told the obviously concerned trial judge that whatever would be in store for him if the respirator were removed, "it can't be worse than what I'm going through now."
Pursuant to all of the foregoing, and upon the petition of Mr. Perlmutter himself, the trial judge entered a detailed and thoughtful final judgment which included the following language:
ORDERED AND ADJUDGED that Abe Perlmutter, in the exercise of his right of privacy, may remain in defendant hospital *162 or leave said hospital, free of the mechanical respirator now attached to his body and all defendants and their staffs are restrained from interfering with Plaintiff's decision.
We agree with the trial judge.
The State's position is that it (1) has an overriding duty to preserve life, and (2) that termination of supportive care, whether it be by the patient, his family or medical personnel, is an unlawful killing of a human being under the Florida Murder Statute Section 782.04, Florida Statutes (1977) or Manslaughter under Section 782.08. The hospital, and its doctors, while not insensitive to this tragedy, fear not only criminal prosecution if they aid in removal of the mechanical device, but also civil liability. In the absence of prior Florida law on the subject, their fears cannot be discounted.
The pros and cons involved in such tragedies which bedevil contemporary society, mainly because of incredible advancement in scientific medicine, are all exhaustively discussed in Superintentent of Belchertown v. Saikewicz, Mass., 370 N.E.2d 417 (1977). As Saikewicz points out, the right of an individual to refuse medical treatment is tempered by the State's:
1. Interest in the preservation of life.
2. Need to protect innocent third parties.
3. Duty to prevent suicide.
4. Requirement that it help maintain the ethical integrity of medical practice.
In the case at bar, none of these four considerations surmount the individual wishes of Abe Perlmutter. Thus we adopt the view of the line of cases discussed in Saikewicz which would allow Abe Perlmutter the right to refuse or discontinue treatment based upon "the constitutional right to privacy ... an expression of the sanctity of individual free choice and self-determination." (Id. 426.) We would stress that this adoption is limited to the specific facts now before us, involving a competent adult patient. The problem is less easy of solution when the patient is incapable of understanding and we, therefore, postpone a crossing of that more complex bridge until such time as we are required to do so.

PRESERVATION OF LIFE
There can be no doubt that the State does have an interest in preserving life, but we again agree with Saikewicz that "there is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long and at what cost to the individual [his] life may be briefly extended." (Id. 425-426.) In the case at bar the condition is terminal, the patient's situation wretched and the continuation of his life temporary and totally artificial.
Accordingly, we see no compelling State interest to interfere with Mr. Perlmutter's expressed wishes.

PROTECTION OF THIRD PARTIES
Classically, this protection is exemplified in the case Application of the President and Directors of Georgetown College, Inc., 118 U.S. App. D.C. 80, 331 F.2d 1000, cert. denied, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964), where the patient, by refusing treatment, is said to be abandoning his minor child, which abandonment the State as parens patriae sought to prevent. We point out that Abe Perlmutter is 73, his family adult and all in agreement with his wishes. The facts do not support abandonment.

PREVENTION OF SUICIDE
As to suicide, the facts here unarguably reveal that Mr. Perlmutter would die, but for the respirator. The disconnecting of it, far from causing his unnatural death by means of a "death producing agent" in fact will merely result in his death, if at all, from natural causes, Saikewicz, Id., 426, fn. 11. The testimony of Mr. Perlmutter, like the victim in the Georgetown College case, supra, is that he really wants to live, but do so, God and Mother Nature willing, under *163 his own power. This basic wish to live, plus the fact that he did not self-induce his horrible affliction, precludes his further refusal of treatment being classed as attempted suicide.
Moreover we find no requirement in the law that a competent, but otherwise mortally sick, patient undergo the surgery or treatment which constitutes the only hope for temporary prolongation of his life. This being so, we see little difference between a cancer ridden patient who declines surgery, or chemotherapy, necessary for his temporary survival and the hopeless predicament which tragically afflicts Abe Perlmutter. It is true that the latter appears more drastic because affirmatively, a mechanical device must be disconnected, as distinct from mere inaction. Notwithstanding, the principle is the same, for in both instances the hapless, but mentally competent, victim is choosing not to avail himself of one of the expensive marvels of modern medical science.
The State argues that a patient has no right to refuse treatment and cites several of the familiar blood transfusion cases.[1] However, a reading of these reveal substantial distinctions between them and the case at bar. In the blood transfusion cases, the patient is either incompetent to make a medical decision, equivocal about making it ("he would not agree to be transfused but would not resist a court order permitting it because it, because it would be the court's will and not his own."[2]) or it is a family member making the decision for an inert or minor third party patient. By contrast, we find, and agree with, several cases upholding the right of a competent adult patient to refuse treatment for himself.[3] From this agreement, we reach our conclusion that, because Abe Perlmutter has a right to refuse treatment in the first instance, he has a concomitant right to discontinue it.

ETHICS OF MEDICAL PRACTICE
Lastly, as to the ethical integrity of medical practice, we again adopt the language of Saikewicz:
The last State interest requiring discussion is that of the maintenance of the ethical integrity of the medical profession as well as allowing hospitals the full opportunity to care for people under their control. See Georgetown, supra; United States v. George, supra; John F. Kennedy Memorial Hosp. v. Heston, supra [58 N.J. 576, 279 A.2d 670]. The force and impact of this interest is lessened by the prevailing medical ethical standards, see Byrn, supra at 31. Prevailing medical ethical practice does not, without exception, demand that all efforts toward life prolongation be made in all circumstances. Rather, as indicated in Quinlan, the prevailing ethical practice seems to be to recognize that the dying are more often in need of comfort than treatment. Recognition of the right to refuse necessary treatment in appropriate circumstances is consistent with existing medical mores; such a doctrine does not threaten either the integrity of the medical profession, the proper role of hospitals in caring for such patients or the State's interest in protecting the same. It is not necessary to deny a right of self-determination to a patient in order to recognize the interests of doctors, hospitals, and medical personnel in attendance on the patient. Also, if the doctrines of informed consent and right of privacy have as their foundations *164 the right to bodily integrity, see Union Pac. Ry. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), and control of one's own fate, then those rights are superior to the institutional considerations. (Id. 426-427, footnotes omitted)
It is our conclusion, therefore, under the facts before us, that when these several public policy interests are weighed against the rights of Mr. Perlmutter, the latter must and should prevail. Abe Perlmutter should be allowed to make his choice to die with dignity, notwithstanding over a dozen legislative failures in this state to adopt suitable legislation in this field. It is all very convenient to insist on continuing Mr. Perlmutter's life so that there can be no question of foul play, no resulting civil liability and no possible trespass on medical ethics. However, it is quite another matter to do so at the patient's sole expense and against his competent will, thus inflicting never ending physical torture on his body until the inevitable, but artificially suspended, moment of death. Such a course of conduct invades the patient's constitutional right of privacy, removes his freedom of choice and invades his right to self-determine.
The judgment of the trial court is hereby affirmed. In addition, all time periods having hitherto been waived, it is required that any petition for rehearing be actually received by this court no later than noon on Tuesday, September 19, 1978. Copies of any such petition shall likewise be simultaneously hand delivered to all parties entitled thereto. As to response, any such shall be delivered to this court no later than noon on Friday, September 22, 1978.
This is unquestionably a matter of great public interest and we have considered certification to our Supreme Court. Although we here carry an unusually heavy burden, and it would be a relief to share it, we feel that the exigencies of this situation dictate our conclusion without certification.
AFFIRMED.
MOORE, J., concurs.
ANSTEAD, J., concurs specially with opinion.
ANSTEAD, Judge, specially concurring:
I am in complete agreement with the majority opinion, but I am also of the firm opinion that the question decided today is one of great public interest that should be certified for review to the Florida Supreme Court under the provisions of Article V, Section 3(b)(3), of the Florida Constitution, and I must note my disagreement with my colleagues to the extent that they decline to certify the question for consideration by the Supreme Court.
Without such a certification it is doubtful whether the Supreme Court will have jurisdiction to review this decision. The Supreme Court's jurisdiction is limited by Article V, Section 3 of the Constitution. Everyone agrees that this is a case of first impression in the appellate courts of Florida. Hence, there is no case in conflict with this decision that would give rise to conflict certiorari jurisdiction in the Supreme Court. It may be that jurisdiction would vest under the provisions of Section 3(b)(1) whereby decisions construing a provision of the state or federal constitution are made reviewable. Our decision today rests primarily on a recognition of a constitutional right of privacy. However, the question presented is a question of great public interest and the framers of our state constitution surely had such questions in mind when providing for review by the Supreme Court of questions so certified by the District Courts of Appeal. While convinced of the soundness of our decision today, I am concerned that the decision may not receive the full review intended under the terms of the Constitution.
NOTES
[1] Application of the President and Directors of Georgetown College, Inc., 118 U.S.App.D.C. 80, 331 F.2d 1000 (D.C. Cir.1964) cert. den., 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); U.S. v. George, 239 F. Supp. 752 (D.Conn. 1965); Powell v. Columbian Presbyterian Medical Center, 49 Misc.2d 215, 267 N.Y.S.2d 450 (Sup.Ct. 1965).
[2] U.S. v. George, supra, at 753.
[3] Superintendent of Belchertown v. Saikewicz, Mass., 370 N.E.2d 417 (1977). In the Matter of Schiller, 148 N.J. Super. 168, 372 A.2d 360 (1977); In the Matter of Melideo, 88 Misc.2d 974, 390 N.Y.S.2d 523 (Sup.Ct. 1976); In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976); In re Osborne, 294 A.2d 372 (D.C.App. 1972); In re Estate of Brooks, 32 Ill.2d 361, 205 N.E.2d 435 (1965); Erickson v. Dilgard, 44 Misc.2d 27, 252 N.Y.S.2d 705 (1962); see Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).