**In re Joseph V. GARDNER.**

Supreme Judicial Court of Maine.

Argued Sept. 18, 1987.
Decided Dec. 3, 1987.

Janet T. Mills (orally), Dist. Atty., Auburn, for appellant.

Robert C. Robinson, Roginson, Kriger & McCallum, P.A., Portland, Edward R. Grant, Clarke D. Forsyth, Chicago, Ill., for amici curiae Americans United for Life Legal Defense Fund.

Stephen Whiting, Hewes, Douglas, Whiting & Quinn, Portland, Steven F. McDowell, Walter M. Weber, Milwaukee, Wis., for amici curiae Catholic League for Religious and Civil Rights.

Daniel P. Barrett, Portland, James Bopp, Jr., Thomas J. Marzen, Mary M. Nimz, Indianapolis, Ind., for amici curiae Ethics and Advocacy Task Force of the Nursing Home Action Group.

Roscoe H. Fales (orally), Fales & Fales, Lewiston, for Rosemary Sacre.

Andrew B. Choate, (on brief) for Rosemary Sacre.

Jon S. Oxman (orally), Linnell, Choate & Webber, Auburn, for guardian ad litem.

Leigh Ingalls Saufley (orally), Deputy Atty. Gen. Human Services Sec., Augusta.

Jane P. Andrews, Lewiston, Fenella Rouse, Elena N. Cohen, New York City, for amicus curiae Society for the Right to Die.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

McKUSICK, Chief Justice.

This case poses the sensitive question, novel to us, of when life-sustaining procedures may be discontinued for a hospital patient in a persistent vegetative state with no hope for improvement. The Superior Court (Androscoggin County) declared that in the specific circumstances presented by

the facts of this case those procedures may be discontinued. We agree.

Requiring proof by clear and convincing evidence, the Superior Court after extensive hearings found the following facts among others: On May 11, 1985, Joseph V. Gardner, then nearly 23 years of age, suffered "severe, permanent and totally disabling" injuries to his head when he fell from the back of a moving pickup truck. Despite heroic surgical and rehabilitative efforts and the best of medical care and treatment, Gardner since the accident "has never regained consciousness" and has been "in a chronic and persistent vegetative state without hope of regaining any cognitive or voluntary bodily functions by any known or anticipated medical procedures." "He is totally incapable of feeding himself or ingesting food or drink by normal means. He is unable to chew or swallow." A patient at Central Maine Medical Center (CMMC) in Lewiston, Gardner is kept alive by the artificial introduction of nutrition and hydration through a so-called Dobbhoff nasogastric (NG) tube inserted by medical personnel through his nose and esophagus into his stomach and intestines. His "body is almost totally spastic" and so rigid that the nurses must pry his legs apart to wash him. He has no control over his bowel, bladder and other bodily functions. "He cannot ... voluntarily move any parts of his body." "There is no evidence of any thought process, emotion or pain." Prior to the 1985 accident Gardner had declared his "intent and desire that he not be maintained on the nasogastric tube"; that he would rather die than be maintained in a persistent vegetative state by artificial means. In the event that Gardner's stated wish is respected, his "death will be without conscious pain or discomfort" and will come within three to fourteen days.

The Superior Court held that "[t]he State's right to preserve life and prevent suicide does not overcome Gardner's inherent right ... to make a decision to terminate or withdraw life-sustaining treatment" and declared that Gardner's mother acting as his guardian has the authority to have carried out his stated wish for the removal of the NG tube as well as any other life-sustaining procedures. In addition, the Superior Court declared that no health care facility or personnel are subject to any criminal or civil liability or profesional discipline for permitting such removal, and that any such facility or personnel may affirmatively decline to participate in such removal subject to a duty to take reasonable steps to effect or assist with a transfer of Gardner to another facility if requested. All of Gardner's family and close friends who testified at trial had urged the Superior Court that Gardner's pre-accident decision not to be kept alive artificially in a persistent vegetative state should be respected. So also had the Maine Department of Human Services [1] and Gardner's court-appointed guardian *ad litem* after each had made an independent investigation. The District Attorney for Prosecutorial District 3, however, at trial took the opposing position and has now appealed the Superior Court's judgment.[2] We affirm the Superior Court.

The Superior Court based its holding in part upon Gardner's own personal decision declared prior to his accident, and in part upon a theory of "substituted judgment"; namely, the exercise of judgment on behalf of a now incompetent Gardner as to what he, if he were currently competent and conscious, would want done. On the basis of clear and convincing evidence, the court made findings that fully support both grounds for its holding. In affirming the judgment of the Superior Court, however,

1. In appearing in the declaratory judgment action brought by CMMC, the Maine Department of Human Services acted pursuant to its responsibilities under the Adult Protective Services Act, 22 M.R.S.A. §§ 3470–3476 (Supp.1986).

2. On the District Attorney's appeal, we have received briefs from Gardner's mother-guardian, the Maine Department of Human Services,

and Gardner's guardian *ad litem,* all as appellees. We have also received briefs *amici curiae* from the Society for the Right to Die, the Ethics and Advocacy Task Force of the Nursing Home Action Group, the Catholic League for Religious and Civil Rights, and the Americans United for Life Legal Defense Fund.

we do not find it necessary to go beyond Gardner's own personal decision. Gardner's case is entirely different from those cases of "substituted judgment" where the patients, now incompetent, have never stated their intent and desire as to being kept alive in an irreversible vegetative state by artificial means. Here we need no substitute for Gardner's own personal judgment. Here Gardner before his terrible accident had made his pertinent wishes well known and the Superior Court specifically so found. Therefore, the only question we need address is whether a person who is now in a persistent vegetative state may compel the discontinuation of life-sustaining procedures by means of the decision that he declared before he lost competency.

Any resolution of that narrow question must begin with a recognition of the long-standing importance in our Anglo–American legal tradition of personal autonomy and the right of self-determination. John Stuart Mill, in his classic defense of individual autonomy, set forth what he perceived as the proper scope of personal liberty:

The only part of the conduct of any one, for which he is amenable to society, is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute. Over himself, over his own body and mind, the individual is sovereign.

J.S. Mill, *On Liberty*, reprinted in *Three Essays* 5, 15 (1975) (first published in 1859). A recent article on patient autonomy modified, as concerns medical treatment, Mill's description of the scope of self-determination, stating: "In general, the more intense and personal the consequences of a choice and the less direct or significant the impact of that choice upon others, the more compelling the claim to autonomy in the making of a given decision." Shultz, *From Informed Consent to Patient Choice: A New Protected Interest*, 95 Yale L.J. 219, 220 (1985).

American courts and commentators have long emphasized the importance of personal autonomy, especially in the realm of medical care. Before the turn of the centu-ry, Justice Gray writing for the United States Supreme Court declared:

No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Ry. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). Writing for the New York Court of Appeals two decades later, Judge Cardozo, in *Schloendorff v. Society of New York Hosp.*, 211 N.Y. 125, 129–30, 105 N.E. 92, 93 (1914), concurred:

Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages.

*See, e.g., Canterbury v. Spence*, 464 F.2d 772, 780 (D.C.Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Natanson v. Kline*, 186 Kan. 393, 406–07, 350 P.2d 1093, 1104 (1960). In its recently published report on the termination of life-sustaining treatment, the Hastings Center, which devotes itself to the research of ethical problems in medicine, biology, and the life sciences, states:

[O]ur ethical framework draws on the value of patient autonomy or self-determination, which establishes the right of the patient to determine the nature of his or her own medical care. This value reflects our society's long-standing tradition of recognizing the unique worth of the individual. We respect human dignity by granting individuals the freedom to make choices in accordance with their own values. The principle of autonomy is the moral basis for the legal doctrine of informed consent, which includes the right of informed refusal.

Hastings Center, *Guidelines on the Termination of Life–Sustaining Treatment and the Care of the Dying* 7 (1987) [hereinafter Hastings Center, *Terminating Life–Sustaining Treatment*]. A presidential com-

mission consisting entirely of health care professionals except for its Chairman, the distinguished attorney Morris B. Abram, made the identical point in its 1983 Report. President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life–Sustaining Treatment* 26 (1983) [hereinafter President's Commission, *Deciding to Forego Life–Sustaining Treatment*]. *See also* N. Cantor, *Legal Frontiers of Death and Dying* 8–9 (1987).

Reflecting the central importance of personal autonomy in our legal tradition, many courts have now recognized the right of an individual to refuse the continuation of life-sustaining care. *See, e.g., Bartling v. Superior Court,* 163 Cal.App.3d 186, 209 Cal. Rptr. 220 (1984) (allowing a nonterminally ill competent patient to refuse all life-sustaining procedures); *Satz v. Perlmutter,* 362 So.2d 160, 162 (Fla.Dist.Ct.App.1978), *aff'd,* 379 So.2d 359 (Fla.1980) (allowing a terminally ill competent patient to order withdrawal of a respirator); *Brophy v. New England Sinai Hosp.,* 398 Mass. 417, 439–42, 497 N.E.2d 626, 638–40 (1986) (allowing discontinuation of the nutrition and hydration of a nonterminally ill incompetent patient); *In re Farrell,* 108 N.J. 335, 358, 529 A.2d 404, 416 (1987) (allowing terminally ill competent person to compel discontinuation of life-sustaining care). In recognizing the patient's right to control his medical care, the Massachusetts Supreme Judicial Court has emphasized the individual's "strong interest in being free from nonconsensual invasion of his bodily integrity." *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 739, 370 N.E.2d 417, 424 (1977) [hereinafter *Saikewicz*].

■ The personal right to refuse life-sustaining treatment is now firmly anchored in the common law doctrine of informed consent, which requires the patient's informed consent to the administration of any medical care. *See Saikewicz,* 373 Mass. at 738–39, 370 N.E.2d at 424; *In re Jobes,* 108 N.J. 394, 430–32 & n. 3, 529 A.2d 434, 453–54 & n. 3 (1987) (Handler, J., concurring); *In re Conroy,* 98 N.J. 321, 348, 486 A.2d 1209, 1222–23 (1985) (right to decline medical treatment is "embraced within the common-law right to self-determination"). Under this common law doctrine, "[t]he patient's ability to control his bodily integrity through informed consent is significant only when one recognizes that this right also encompasses a right to informed refusal." *Conroy,* 98 N.J. at 347, 486 A.2d at 1222.

■ We have noted in the past that Maine's law of informed consent supports the right of an individual to decline medical care. In *Downer v. Veilleux,* 322 A.2d 82, 90–91 (Me.1974), we joined the majority of states that have "recognized the doctrine of informed consent as an actionable species of medical negligence." *Woolley v. Henderson,* 418 A.2d 1123, 1128 & n. 3 (Me.1980). When the principles of informed consent are viewed in the context of a medical malpractice action, a court focuses less on the patient's interest in self-determination than on the doctor's compliance with reasonable medical practices. *Id.* at 1129–30. Nevertheless, we have continued to recognize the validity of a battery analysis, with its focus on the patient's right to be free from nonconsensual invasions of his bodily integrity, when the treatment applied by the doctor "is either against the patient's will or substantially at variance with the consent given." *Downer v. Veilleux,* 322 A.2d at 89. *See also Woolley v. Henderson,* 418 A.2d at 1133 & n. 11. Thus when a competent patient has expressly refused to receive some form of medical care, a doctor would be acting tortiously if he insisted on providing the treatment against his patient's will. As we explained in *Downer:*

> The rationale of this rule lies in the fact that every competent adult has the right to forego treatment, or even cure, if it entails what for him are intolerable consequences or risks, however unwise his sense of values may be to others.

*Downer v. Veilleux,* 322 A.2d at 91. An individual's right to control his medical care is not lessened when the treatment at issue involves life-sustaining medical procedures. *See, e.g., John F. Kennedy Memo-*

*rial Hosp. v. Bludworth,* 452 So.2d 921, 924 (Fla.1984). In accordance with these considerations and the great weight of authority in other states, we recognize under Maine's common law of informed consent the personal right of any individual to refuse life-sustaining procedures.[3]

■ Courts have wrestled with the difficulty of protecting the right of self-determination in cases where the patient who has previously made no controlling medical decision has come into a persistent vegetative state and is therefore no longer able to make or communicate any personal decision. In that situation many courts have followed the lead of the Massachusetts court, *Saikewicz,* 373 Mass. at 750–53, 370 N.E.2d at 430–31, in using a "substituted judgment" test to determine whether a now incompetent person would have chosen, if he were competent, to order discontinuation of the life-sustaining system. *See In re Conroy,* 98 N.J. at 360–61, 486 A.2d at 1229. As we at the outset noted, however, we affirm the result reached by the Superior Court in this case without any reliance upon the court's finding of substituted judgment. The court's finding of a pre-accident decision by Gardner himself fully supports the relief granted without more.[4] Although Gardner is now in a condition that prevents him from making and communicating a decision as to his care,

the trial justice found by clear and convincing evidence after an extensive hearing that Gardner had prior to his accident made a "declaration of intent and desire that he not be maintained on the nasogastric tube...." All that our affirmance of the Superior Court's ruling does is to respect Gardner's own personal decision that he is not to be kept alive in a persistent vegetative state by this or any other life-sustaining procedures.

■ This case parallels closely the circumstances addressed by the New York Court of Appeals in *In re Storar,* 52 N.Y. 2d 363, 376–80, 420 N.E.2d 64, 70–72, 438 N.Y.S.2d 266, 272–74, *cert. denied,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981). One of the cases consolidated in the *Storar* decision involved the withdrawal of the respirator keeping alive Brother Fox, a member of a Catholic religious order, who was in a persistent vegetative state without any chance of recovery. *Id.* at 370–71, 420 N.E.2d at 67–68, 438 N.Y.S. 2d at 269–70. Before he lost competency Brother Fox had said to others that if he came to be in a vegetative state he would not want to be maintained by life-sustaining procedures. *Id.* at 371–72, 420 N.E.2d at 68, 438 N.Y.S.2d at 270. The district attorney objected to discontinuing the life-sustaining treatment, claiming that no

---

**3.** We do not find Maine's recently enacted Living Will Act, 22 M.R.S.A. §§ 2921–2931 (Supp. 1986) (eff. Sept. 19, 1985), relevant to the question now before us. The legislature narrowly defined the life-sustaining procedures that could be' discontinued under the Act to exclude nutrition and hydration, *id.* § 2921(4). The legislature, however, expressly provided that the Act creates no presumption concerning the intention of a person who does not have a document that qualifies as a "living will," *id.* § 2929(4), and that the Act does not limit our power to read more broadly under Maine common law the right of a patient to make decisions concerning life-sustaining care. *Id.* § 2929(5). "In that respect, the provisions of [the Living Will Act] are cumulative." *Id.* Since we are basing our decision on Maine's common law doctrine of informed consent, the Living Will Act does not speak to the question we must here decide. *Accord Corbett v. D'Alessandro,* 487 So.2d 368, 370 (Fla.Dist.Ct.App.), *review denied,* 492 So.2d 1331 (Fla.1986). *See also* Comment, *Maine's Living Will Act and the Termination of Life-Sus-*

*taining Medical Procedures,* 39 Me.L.Rev. 83, 101–04 (1987).

**4.** Very recently, in a case involving an incompetent patient who had not declared in advance a relevant decision as to her medical care, the Arizona Supreme Court delineated the same distinction as we make here, between the patient's own personal decision made previously when competent and the substituted judgment exercised on behalf of the now incompetent patient. *Rasmussen v. Fleming,* 154 Ariz. 207, 218–19, 741 P.2d 674, 685–86 (1987). That court stated:

A competent person clearly has the ability to exercise the right to refuse medical treatment. So, too, does an incompetent individual who has made his or her medical desires known prior to becoming incompetent. Unfortunately, this case involved an individual who was incompetent at the time medical treatment became an issue and who had not expressed her medical treatment desires prior to becoming incompetent.

*Id.* (citation omitted).

third party ought to be able to exercise such a personal right on behalf of a now incompetent patient. The Court of Appeals, however, held that such would not be the case "because here Brother Fox made the decision for himself before he became incompetent." *Id.* at 378, 420 N.E.2d at 72, 438 N.Y.S.2d at 274. We find convincing the New York court's reasoning on this issue, and we hold that when an individual has clearly and convincingly in advance of treatment expressed his decision not to be maintained by life-sustaining procedures in a persistent vegetative state, health care professionals must respect that decision.[5]

■ The Superior Court properly applied a "clear and convincing"[6] standard of proof to establish both that Gardner is in an irreversible and persistent vegetative state and that he had declared in advance of his injury his intent and desire not to receive life-sustaining care if he ever came into a persistent vegetative state. *See In re Storar,* 52 N.Y.2d at 379, 420 N.E.2d at 72, 438 N.Y.S.2d at 274 (clear and convincing standard applied to question of present incompetent's earlier declarations). We review the trial court's factual findings for clear error, M.R.Civ.P. 52, asking only whether the factfinder could rationally have been persuaded that the required findings were established to be highly probable. *See Taylor v. Commissioner of Mental Health and Mental Retardation,* 481 A.2d 139, 153 (Me.1984).

■ The record amply supports the Superior Court's determination that it was Gardner's "declaration of intent and desire that he not be maintained" in his present persistent vegetative state by life-sustaining procedures. He had specifically talked with several of his family and friends about not wanting to be kept alive artificially, if he should meet a medical disaster. For example, Gardner told his girl friend, Deborah Mason, at a time in 1983 when she was working at a nursing home, that people kept alive only by life-sustaining procedures lose their dignity as a result of such treatment and that "he would want to die" rather than be maintained in that condition. Gardner said to Ms. Mason, "I would not want to live ... that way." In addition, only a month before Gardner's accident he discussed with Alan Holbrook, one of his closest friends, the possibility of being kept alive in a vegetative state by life-sustaining procedures. Gardner had said to Holbrook in a very serious manner that he "would definitely want to die if he was ever in a vegetable state." Both his mother and his brother recalled that Gardner had specifically observed friends and neighbors in desperate medical straits and had declared that he did not want to be kept alive artificially if he ever came into that condition. It is apparent from the testimony that what was on Gardner's mind was not only the invasiveness of life-sustaining systems, such as the NG tube, upon the integrity of his body. It was also the utter helplessness of the permanently comatose person, the wasting of a once strong body, and the submission of the most private bodily functions to the attention of others. In the face of those understandable concerns, "[t]he law recognizes the individual's right to preserve his humanity, even if to preserve his humanity means to allow the natural processes of a disease or affliction to bring about a death with dignity." *Brophy v. New England Sinai Hosp.,* 398 Mass. at 434, 497 N.E.2d at 635.

---

**5.** We note that some courts have refused to allow discontinuation of a person's life-sustaining care when the interests of minor children were at stake. *See In re President of Georgetown College,* 331 F.2d 1000, 1008 (D.C.Cir.) (patient had 7–month–old child), *cert. denied,* 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); *Raleigh Fitkin–Paul Morgan Memorial Hosp. v. Anderson,* 42 N.J. 421, 201 A.2d 537 (patient 8 months pregnant), *cert. denied,* 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964). Here not only is Gardner unmarried and without children, but also all of his family members who testified urge the court to respect his pre-accident decision.

**6.** At one point the Superior Court's opinion states that the testimony "plainly and unequivocally" establishes Gardner's decision to reject any treatment that would keep him alive in a persistent vegetative state. "Plain and unequivocal" is at least as stringent a standard as "clear and convincing." *See Berry v. Maywood Mut. Water Co.,* 11 Cal.App.2d 479, 480–81, 53 P.2d 1032, 1032–33 (1936).

Gardner is in a persistent vegetative state without any hope for change for the better. His biological existence is maintained by use of an NG tube to replace his bodily functions of chewing and swallowing that were destroyed in the accident. Gardner's decision made clear in advance of his injury applies specifically to the circumstances in which he now exists. We see no reason not to respect Gardner's personal decision and allow the discontinuation of life-sustaining treatment. *In re Storar*, 52 N.Y.2d at 377–80, 420 N.E.2d at 71–72, 438 N.Y.S.2d at 273–74. It is not insignificant that the Superior Court's decision to respect Gardner's stated wishes has the concurrence of all those closest and dearest to him—his family and friends—as well as the support of the DHS and the guardian *ad litem*, the two outside parties who are charged by law with investigating Gardner's circumstances and with ensuring that his personal interests are protected.

■ A different result is not warranted simply because the life-sustaining procedure at issue involves the artificial provision of nutrition and hydration. There is no meaningful ground for distinguishing the artificial provision of nutrition and hydration through an NG tube from other forms of life-sustaining procedures such as a respirator, which provides another essential of life, oxygen, or a dialysis machine, which attends to another essential of life, waste disposal.[7] All state high courts that have directly addressed this issue have refused to draw such a distinction. *See, e.g., Rasmussen v. Fleming*, 154 Ariz. 207, 217, 741 P.2d 674, 684 (1987); *Brophy v. New England Sinai Hosp.*, 398 Mass. at 435–39, 497 N.E.2d at 636–38; *In re Peter*, 108 N.J. 365, 379–83, 529 A.2d 419, 427–28 (1987); *In re Jobes*, 108 N.J. at 414, 529 A.2d at 444 n. 9; *In re Conroy*, 98 N.J. at 372–74, 486 A.2d at 1235–37. The 1987 report by

the Hastings Center states that "all medical techniques for supplying nutrition and hydration that involve bodily invasion should be a matter of choice by the patient or surrogate...." Hastings Center, *Terminating Life–Sustaining Treatment* 61 (1987); *see also id.* at 59–60. The American Medical Association's Council on Ethical and Judicial Affairs equates "artificially or technologically supplied respiration, nutrition or hydration" to other forms of life-prolonging medical treatment for purposes of defining the right of the patient to accept or reject those bodily invasions. American Medical Association, *Current Opinions of the Council on Ethical and Judicial Affairs* § 2.18, at 12–13 (1986). *See also* President's Commission, *Deciding to Forego Life–Sustaining Treatment* 2–3, 190 (1983) (voluntary choice of patient should determine whether or not life-sustaining therapy, including respirators and special feeding procedures, will be undertaken or maintained); Los Angeles County Medical and Bar Associations, *Principles and Guidelines Concerning the Foregoing of Life–Sustaining Treatment for Adult Patients* 4 (1986) ("all life-sustaining interventions, including nutrition and hydration, are legally equivalent"). *See generally* N. Cantor, *Legal Frontiers of Death and Dying* 38–40 (1987); *By No Extraordinary Means: The Choice To Forgo Life–Sustaining Food and Water* (J. Lynn ed. 1986).

Some commentators have suggested a special symbolic importance in providing nutrition and hydration, as opposed to other forms of treatment, to those unable to care for themselves. *See, e.g.,* "On Feeding the Dying," *Hastings Center Report*, Oct. 1983, at 22. Yet any such symbolism lies in the reciprocity of giving and receiving, such as occurs between parent and

---

7. A physician, after describing the various alternative medical procedures for artificially providing food and water to a patient, including the use of an NG tube, has written in summary:

Efficient provision of nutrition with any of these procedures requires skilled personnel and specialized techniques, often as special nutrition support teams in hospitals. The standards required are quite exacting, and

substantial deviation from them greatly increases risks of infection or illness arising from erroneous nutritional balance.

Major, "The Medical Procedures for Providing Food and Water: Indications and Effects," in *By No Extraordinary Means: The Choice to Forgo Life–Sustaining Food and Water* 21, 27 (J. Lynn ed. 1986).

infant. Carson, "The Symbolic Significance of Giving to Eat and Drink," in *By No Extraordinary Means: The Choice to Forgo Life–Sustaining Food and Water* 84, 87 (J. Lynn ed. 1986). The symbolism is lost in the artificial introduction of food and fluid into the body of someone in Gardner's unfortunate condition. There is no symbolic virtue in imposing that procedure upon the body of a person who previously declared that he would not want to receive such treatment but who now is no longer able personally to prevent what is being done to his body.

■ Other courts have noted that in some circumstances certain state interests may outweigh the patient's right to compel discontinuation of life-sustaining care. *See, e.g., Satz v. Perlmutter*, 362 So.2d at 162; *Brophy v. New England Sinai Hosp.*, 398 Mass. at 432, 497 N.E.2d at 634; *In re Peter*, 108 N.J. at 426, 529 A.2d at 427. On the specific facts of this case, however, we can identify no state interests sufficiently strong to outweigh Gardner's specific personal decision made prior to his injury that life-sustaining procedures not be used to maintain him in the condition caused by his tragic accident. Generally, the most important state interest that will arise when a patient is incompetent at the time life-sustaining procedures are to be removed is the interest in protecting from abuse those persons no longer able to care for themselves. *See* Adult Protective Services Act, 22 M.R. S.A. § 3473 (Supp.1986) (Act's purpose is to protect incapacitated adults in circumstances "which present a substantial risk of abuse").[8] Nevertheless, that state interest is not implicated when the trial court has found as a fact, as it has here, that the incompetent person himself decided and expressly declared before his injury that he did not want to have artificial procedures applied to him to keep him alive in a persistent vegetative state. *In re Storar*, 52 N.Y.2d at 377, 420 N.E.2d at 71, 438 N.Y.S. 2d at 273. Rather, the greater risk of abuse lies in disregarding such specifically declared personal decisions and in imposing

life-sustaining procedures upon the patient contrary to his express will. *Cf. Saikewicz*, 373 Mass. at 742, 370 N.E.2d at 426 ("The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice").

■ Similarly, we do not believe that a decision to allow discontinuation of life-sustaining procedures in the narrow circumstances of the present case in any way rests upon a quality-of-life determination—by the courts or by anyone else other than Gardner. The Superior Court found that Gardner decided for himself that he does not want life-sustaining procedures in a situation like his present one. Thus Gardner has himself done the balancing of his own values and their bearing on the question of whether to be kept alive in a persistent vegetative state by artificial means. That personal weighing of values is the essence of self-determination. In ruling to respect the personal choice made by Gardner, therefore, we judges do not ourselves engage in an independent assessment of the value of his life. *See* Hastings Center, *Terminating Life–Sustaining Treatment* 134 (1987). We are only recognizing and effectuating his right of self-determination.

■ Gardner's decision to live without artificial life-sustaining procedures would not constitute suicide since the grievous injuries resulting in his present condition were not self-inflicted. He in no sense has decided to kill himself. Gardner did not suffer his injuries by intentionally placing himself in such a position that his continued biological existence would depend upon the provision of life-sustaining procedures. Accident has brought him to that state. Following his mishap Gardner is simply exercising his right to control the course of his medical care. Because of the unfortunate condition into which his 1985 accident put him, his refusal of all artificial feeding will be followed by death. Yet this coupling of his treatment decision and his ulti-

---

**8.** The state agency charged with carrying out the state's interest under the Adult Protective Services Act appears before this court in support of the Superior Court's decision. See n. 1 above.

mate death should not mask the obvious point that the cause of his death will be not his refusal of care but rather his accident and his resulting medical condition, including his inability to ingest food and water. *See, e.g., In re Conroy,* 98 N.J. at 355, 486 A.2d at 1226. Forcing upon him the life-sustaining procedures he has decided to refuse would only prolong the ultimate moment of his death. His decision not to receive such procedures, far from constituting suicide, is a choice to allow to take its course the natural dying process set in motion by his physiological inability to chew or swallow. *See In re Storar,* 52 N.Y.2d at 377 n. 6, 420 N.E.2d at 71 n. 6, 438 N.Y.S.2d at 273 n. 6 (death will not be suicide since Brother Fox's condition "was not self-inflicted"). *See also Rasmussen v. Fleming,* 154 Ariz. at 218, 741 P.2d at 685 (refusing medical treatment merely allows disease to take its course and death is not result of self-inflicted injuries) (quoting *In re Conroy,* 98 N.J. at 351, 486 A.2d at 1224); *Satz v. Perlmutter,* 362 So.2d at 162–63 (discontinuation of treatment would not be suicide since patient "really wants to live, but do so ... under his own power"); *Saikewicz,* 373 Mass. at 743 n. 11, 370 N.E.2d at 426 n. 11 (discontinuation is not suicide since patient has no "specific intent to die" and "did not set the death producing agent in motion"); N. Cantor, *Legal Frontiers of Death and Dying* 46–47 (1987).

■ The Superior Court correctly ruled that no health care facility or health care personnel will be subject to criminal or civil liability or professional discipline for participating in the discontinuation of Gardner's life-sustaining procedures in these circumstances. The court's ruling that Gardner is entitled to have his own personal decision to refuse life-sustaining procedures carried out in his present condition precludes a finding that anyone who assists the discontinuation of those procedures in a responsible and humane manner could be guilty of either a criminal offense or a breach of due care or professional responsibility.

*See In re Storar,* 52 N.Y.2d at 377, 420 N.E.2d at 71, 438 N.Y.S.2d at 273.

■ When Gardner suffered his tragic accident two and a half years ago, he by reason of the resulting incapacity lost none of his personal and civil rights, least of all his right to have his own decisions carried out on what should or should not be done to care for his body. The common law of Maine recognizes Gardner's right of self-determination in matters of health care to be essential to the integrity and dignity of his person. Once the Superior Court determined by clear and convincing evidence that Gardner had made a pre-accident decision as to what treatment he should receive in the event he got into the unfortunate state to which his accident has now brought him, the court had no other course than to respect that personal decision and to authorize its effectuation. In carrying out Gardner's decision, his guardian should of course ensure that he continues to receive the palliative care necessary to deal with his physical condition in a humane manner.[9]

The entry is:

Judgment affirmed.

NICHOLS, GLASSMAN and SCOLNIK, JJ., concurring.

CLIFFORD, Justice, with whom ROBERTS and WATHEN, JJ., join, dissenting.

I respectfully dissent.

I agree that the evidence supports the finding of the Superior Court as to Joseph Gardner's persistent, vegetative and incognitive condition.

I do not agree that the Superior Court's finding that Gardner would want the naso-gastric feeding and hydration tube removed is based on sufficiently clear and convincing evidence so as to constitute an informed refusal. Moreover, this Court has failed to properly assess and balance the right to refuse life-sustaining procedures and the state's legitimate interest in preserving life and preventing suicide.

---

9. *See, e.g.,* Schmitz & O'Brien, "Observations on Nutrition and Hydration in Dying Cancer Patients," in *By No Extraordinary Means: The*

*Choice to Forgo Life–Sustaining Food and Water* 29, 31–33 (J. Lynn ed. 1986).

## I.

This Court grounds its decision on the right to refuse medical treatment and determines that right to be firmly anchored in the common law doctrine of informed consent. 534 A.2d at 951. Before a consent to undergo medical treatment can be said to be "informed," a patient must be provided with sufficient information to enable the patient to understand the procedures and inherent risks and hazards involved in the treatment. *Downer v. Veilleux,* 322 A.2d 82, 90–91 (Me.1974); 24 M.R.S.A. § 2905 (Supp.1987). In view of the strong public policy in favor of preserving life, *see In re Conroy,* 98 N.J. 321, 486 A.2d 1209, 1233 (1985), the decision to refuse medical treatment, especially where certain death will result, should be at least as informed as the decision to consent to treatment.

There is no evidence that Joseph Gardner ever expressed his wishes in writing or orally as to specific circumstances under which he wished life-sustaining measures to be discontinued, and the Superior Court acknowledged that the conversations of Gardner upon which it relied were "casual and of a general nature rather than about specific cases." The court relied in large measure upon Gardner's active life-style in finding that he would want the feeding tube removed. That type of evidence, if offered to support a decision of informed consent, would be woefully inadequate. It is all the more inadequate to support a refusal that will result in certain death. In the present case there is no basis for concluding that Joseph Gardner's refusal is informed.

1. For example, it is common for states to require immunization of students in the interest of public health. *See* 20–A M.R.S.A. §§ 6352–6359 (Supp.1987). *See also* 534 A.2d at 953 n. 5.

2. Because this Court upholds the right of health care providers and personnel to refuse to participate in the withdrawal of life-sustaining procedures, that state interest is not directly implicated here.

3. 17–A M.R.S.A. § 106(6) (1983) provides:
   A person acting under a reasonable belief that another person is about to commit suicide or to inflict serious bodily injury upon himself may use a degree of force on such person as he reasonably believes to be necessary to thwart such a result.

## II.

Even if the evidence did support the trial court's determination of Joseph Gardner's intent, I would not affirm the judgment. I do not dispute this Court's holding that a person has a substantial right to refuse medical treatment, including life-sustaining medical procedures. That right, however, is not absolute and must be measured against the interests of the state in requiring that certain medical procedures be undertaken or in insuring that certain treatment is not withdrawn. *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417, 425 (1977).

Those state interests are a) the preservation of life, b) the protection of the interests of third parties,[1] c) the prevention of suicide and d) maintaining the ethical integrity of the medical profession.[2] *Id.*

The state has an interest in preserving the life of Joseph Gardner as an individual and in preserving life in general. *Conroy,* 486 A.2d at 1223. This interest in preserving life derives from our instinct for self-preservation and is essential to our survival as a civilization. That we protect the lives of the weakest and most vulnerable of our society shows us to be a humane and caring society. *See* 42 U.S.C.A. §§ 5101–5103 (1983 & Supp.1987); 22 M.R.S.A. §§ 3470–3478 (Supp.1987). Likewise, the state's interest in preventing suicide has long been recognized and is reflected in our criminal code. 17–A M.R.S.A. §§ 106(6),[3] 201(1)(C),[4] 204.[5] *See In re Caulk,* 125 N.H. 226, 480 A.2d 93, 96–97 (1984).

4. 17–A M.R.S.A. § 201(1)(C) (1983) provides:
   **1.** A person is guilty of murder if:
   **C.** He intentionally or knowingly causes another human being to commit suicide by the use of force, duress or deception.

5. 17–A M.R.S.A. § 204 (1983) provides:
   **§ 204. Aiding or soliciting suicide**
   **1.** A person is guilty of aiding or soliciting suicide if he intentionally aids or solicits another to commit suicide, and the other commits or attempts suicide.
   **2.** Aiding or soliciting suicide is a Class D crime.

Before the withdrawal of any life-sustaining treatment can be sanctioned, there should be a balancing of the right of the patient to refuse the procedures against the interest of the state in the procedures being continued. In my judgment, this Court has not engaged in a proper balancing and has not properly focused on the patient's intention to refuse medical treatment.

The right to refuse life-sustaining procedures should be respected if the refusal is based on the nature of the procedures, i.e., that they are invasive or painful or produce risks or are of minimum benefit to the patient. *Saikewicz*, 370 N.E.2d at 431–32. To the extent that the Superior Court addressed the use of the nasogastric tube involved in this case, the procedure was shown to be minimally invasive, causing no pain nor risk of any disease or infection, yet sustaining Joseph Gardner with nutrients and water.

We are not faced with a request to withdraw treatment because it is unnecessarily invasive or detrimental to the patient. Rather, the guardian has requested simply that Joseph Gardner "be permitted to die." The Superior Court repeatedly referred to evidence of Joseph Gardner's statements of not wanting to live in a vegetative state, and concluded that he would "want to die." The Superior Court implicitly found that the quality of Joseph Gardner's life is poor and granted to others the right to end his life. By affirming the Superior Court, this Court ignores the legitimate interest our society has in preventing such decisions from being based on the quality of life.

This Court suggests that death will come from the inability of Joseph Gardner to swallow, a result of the tragic accident, and that "[f]orcing upon him the life-sustaining procedures he has decided to refuse would only prolong the ultimate moment of his death." 534 A.2d at 956. But Joseph Gardner is not terminally ill and if the feeding tube is withdrawn, he will starve to death. Drawing a chain of proximate causation from the accident to his death does not lessen the impact of this stark result. The outcome in such a case should not turn on whether the patient has the capacity to swallow, to lift his head, or to sip from a cup.

The Maine Legislature has treated nutrition and hydration differently than other medical or life-sustaining procedures. Nutrition and hydration may not be withdrawn under 22 M.R.S.A. §§ 2921–2931 (Supp.1987), the Maine Living Wills Act, even though the patient has formally executed a will requesting withdrawal. 22 M.R.S.A. § 2921(4). Indeed, no life-sustaining treatment may be withheld or withdrawn under the Act except from a terminally ill patient. 22 M.R.S.A. § 2922(3)(B). This legislative enactment reflects the value placed on life and the significance of food and water to our survival.

We need not decide if nutrition and hydration must always be treated differently than other medical or life-sustaining procedures. Here, however, where food and water are being provided in a non-invasive, pain-free manner to a non-terminally ill patient, the withdrawal of such a feeding tube for the purpose of causing his death ignores the legitimate and longstanding interest of the state in preserving life and preventing suicide, exposes many members of our society to potential abuse, and should not be sanctioned.

Our status as a civilized society is significantly discredited when we abdicate our responsibility to care for those who are unable to care for themselves. The provision of sustenance to the most vulnerable among us serves as a binding value in our society and is an obligation we cannot ignore. This Court's decision, premised on the unarticulated notion that Joseph Gardner's life is not worth maintaining, creates a troubling precedent. Those in our society least able to care for themselves, the disabled, the retarded, the elderly, will not fare well under a quality of life assessment, implicitly used here.

The authorities relied upon by this Court are contrary to values expressed by our legislature and essential to our survival as a caring society. They do not persuade me that the Superior Court judgment should be affirmed. *See* Comment, *Maine's Liv-*

*ing Will Act and the Termination of Life Sustaining Medical Procedures,* 39 Me.L. Rev. 83 (1987).

I would vacate the judgment.