697 So.2d 97 (1997)
Barry KRISCHER, Appellant,
v.
Cecil McIVER, M.D., et al., Appellees.
No. 89837.
Supreme Court of Florida.
July 17, 1997.
*98 Robert A. Butterworth, Attorney General; Michael A. Gross, Assistant Attorney General, Tallahassee; Charles M. Fahlbusch, Assistant Attorney General, Fort Lauderdale; and Parker D. Thomson and Carol A. Licko, Special Assistant Attorneys General of Thomson, Muraro, Razook & Hart, P.A., Miami, for Appellant.
Robert Rivas of Rivas & Rivas, Boca Raton, for Appellees.
Paul X. McMenaman, Steubenville, OH, for Amicus Curiae, International Anti-Euthanasia Task Force.
Steven T. McFarland, Center for Law and Religious Freedom Christian Legal Society, Annandale, VA, for Amici Curiae, Christian Legal Society, Christian Medical & Dental Society, Christian Pharmacists Fellowship International, Fellowship of Christian Physician Assistants, and Nurses Christian Fellowship.
Gary L. Printy, Tallahassee, for Amici Curiae, Not Dead Yet and American Disabled for Attendant Programs Today (ADAPT).
James Bopp, Jr. and Barry A. Bostrom of Bopp, Coleson & Bostrom, Terre Haute, IN, for Amici Curiae, The National Right to Life Committee, Inc. and Florida Right to Life, Inc.
David J. Busch, Tallahassee, for a BiPartisan Group of Florida State Legislators, Amici Curiae.
Marcia Beach, Executive Director and Wayne Hampton Basford, Senior Attorney, Advocacy Center for Persons with Disabilities; and Linda G. Miklowitz, Tallahassee, for Amicus Curiae, Advocacy Center for Persons with Disabilities, Inc.
James Bopp, Jr., Thomas J. Marzen, Daniel Avila and Jane Elizabeth Therese Brockmann, Indianapolis, IN, for, Amici Curiae, The Commission on Aging with Dignity; The National Legal Center for the Medically Dependent & Disabled, Inc., on behalf of its client population, especially those in Florida; Lorraine Banks, L.P.N.; Sally Beach, R.N., *99 individually and on behalf of her patients with terminal conditions; John Connors; John Thomas "Jack" Doucette, by and through his guardian, Margaret Doucette; Kathleen Lumbra; Jose Rodriguez, R. Ph.; and Dr. David L. Vastola, D.O., individually and on behalf of his patients with terminal conditions, Amici Curiae; and The National Catholic Office for Persons with Disabilities and its Florida Network, and the Knights of Columbus and its Florida Members.
John M. Knight, Florida Medical Association, Tallahassee; Christopher L. Nuland, The Winicki & Nuland Law Firm, Jacksonville; Morton J. Morris, The Florida Osteopathic Medical Association, Tallahassee; and Casey J. Gluckman, Gluckman & Gluckman, Crawfordville, for Amici Curiae, The Florida Medical Association, The American Medical Association, Florida Society of Internal Medicine, Florida Society of Thoracic and Cardiovascular Surgeons, The Florida Osteopathic Medical Association, Florida Hospices, Inc., and The Florida Nurses Association.
Thomas A. Horkan, Jr., Victoria H. Pflug and Thomas J. Schulte, Tallahassee, for Amicus Curiae, Florida Catholic Conference.
Tamar Feder, New York City, for Amici Curiae, The Florida Coalition of Mental Health Professionals.
Andrew I. Batavia, Marina L. Fontani and Susan F. Dournaux of McDermott, Will & Emery, Miami, for Amici Curiae, a Coalition of Floridians and Other Americans With Disabilities.
David Allen Buck, Spring Hill, for Amicus Curiae, The Florida Silver Haired Legislature, Inc.
Rosemarie Richard, Advocates for Disability Rights, Inc., Palm City, for Amici Curiae, 25 Religious Organizations, Leaders and Scholars.
Lynn G. Waxman of Lynn G. Waxman, P.A., West Palm Beach, for Amici Curiae, The American Medical Student Association and a Coalition of Florida Medical Professionals.
GRIMES, Justice.
We have on appeal a judgment of the trial court certified by the Fourth District Court of Appeal to be of great public importance and to require immediate resolution by this Court. We have jurisdiction under article V, section 3(b)(5) of the Florida Constitution.
Charles E. Hall and his physician, Cecil McIver, M.D., filed suit for a declaratory judgment that section 782.08, Florida Statutes (1995), which prohibits assisted suicide, violated the Privacy Clause of the Florida Constitution and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.[1] They sought an injunction against the state attorney from prosecuting the physician for giving deliberate assistance to Mr. Hall in committing suicide. After a six-day bench trial, the trial court issued a final declaratory judgment and injunctive decree responding to the "question of whether a competent adult, who is terminally ill, immediately dying and acting under no undue influence, has a constitutional right to hasten his own death by seeking and obtaining from his physician a fatal dose of prescription drugs and then subsequently administering such drugs to himself." The court concluded that section 782.08 could not be constitutionally enforced against the appellees and enjoined the state attorney from enforcing it against Dr. McIver should he assist Mr. Hall in committing suicide. The court based its conclusion on Florida's privacy provision and the federal Equal Protection Clause but held that there was no federal liberty interest in assisted suicide guaranteed by the federal Due Process Clause.
Mr. Hall is thirty-five years old and suffers from acquired immune deficiency syndrome (AIDS) which he contracted from a blood transfusion. The court found that Mr. Hall was mentally competent and that he was in obviously deteriorating health, clearly suffering, and terminally ill. The court also found that it was Dr. McIver's professional judgment that it was medically appropriate and ethical to provide Mr. Hall with the assistance he requests at some time in the future.
*100 Dr. McIver had testified that he would assist Mr. Hall in committing suicide by intravenous means. In granting the relief sought by the respondents, the court held that "the lethal medication must be self administered only after consultation and determination by both physician and patient that Mr. Hall is (1) competent, (2) imminently dying, and (3) prepared to die." The court explained that Mr. Hall must state that he subjectively believes that his time to die has come because he has no hope for further life of satisfactory quality and would die soon in any event "and that at that time, Dr. McIver must conclude that Mr. Hall's beliefand his chosen optionis objectively reasonable at the time."
The state attorney appealed. The trial court then set aside the automatic stay imposed by Florida Rule of Appellate Procedure 9.310(b)(2). When this Court assumed jurisdiction of the case, we reinstated the stay and provided for expedited review.
At the outset, we note that the United States Supreme Court recently issued two decisions on the subject of whether there is a right to assisted suicide under the United States Constitution. In Washington v. Glucksberg, ___ U.S. ___, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), the Court reversed a decision of the Ninth Circuit Court of Appeals which had held that the State of Washington's prohibition against assisted suicide violated the Due Process Clause. Like the trial court's decision in the instant case, the Court reasoned that the asserted "right" to assistance in committing suicide was not a fundamental liberty interest protected by the Due Process Clause.
In the second decision, the Court upheld New York's prohibition on assisted suicide against the claim that it violated the Equal Protection Clause. Vacco v. Quill, ___ U.S. ___, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). In reversing the Second Circuit Court of Appeals, the Court held that there was a logical and recognized distinction between the right to refuse medical treatment and assisted suicide and concluded that there were valid and important public interests which easily satisfied the requirement that a legislative classification bear a rational relation to some legitimate end. Thus, the Court's decision in Vacco rejected one of the two bases for the trial court's ruling in the instant case.
The remaining issue is whether Mr. Hall has the right to have Dr. McIver assist him in committing suicide under Florida's guarantee of privacy contained in our constitution's declaration of rights. Art. I, § 23, Fla. Const. Florida has no law against committing suicide.[2] However, Florida imposes criminal responsibility on those who assist others in committing suicide. Section 782.08, Florida Statutes (1995), which was first enacted in 1868, provides in pertinent part that "every person deliberately assisting another in the commission of self murder shall be guilty of manslaughter." See also §§ 765.309, 458.326(4), Fla. Stat. (1995) (disapproving mercy killing and euthanasia). Thus, it is clear that the public policy of this state as expressed by the legislature is opposed to assisted suicide.
Florida's position is not unique. Forty-five states that recognize the right to refuse treatment or unwanted life support have expressed disapproval of assisted suicide. Edward R. Grant & Paul Benjamin Linton, Relief or Reproach?: Euthanasia Rights in the Wake of Measure 16, 74 Or. L.Rev. 449, 462-63 (1995). As of 1994, thirty-four jurisdictions had statutes which criminalized such conduct. People v. Kevorkian, 447 Mich. 436, 527 N.W.2d 714 (1994).[3] Since that date, at least seventeen state legislatures have rejected proposals to legalize assisted suicide. Washington.
The only case in the nation in which a court has considered whether assisted suicide is a protected right under the privacy provision *101 of its state's constitution is Donaldson v. Lungren, 2 Cal.App.4th 1614, 4 Cal.Rptr.2d 59, 63 (1992), which held: "We cannot expand the nature of Donaldson's right of privacy to provide a protective shield for third persons who end his life." The court reasoned:
In such a case, the state has a legitimate competing interest in protecting society against abuses. This interest is more significant than merely the abstract interest in preserving life no matter what the quality of that life is. Instead, it is the interest of the state to maintain social order through enforcement of the criminal law and to protect the lives of those who wish to live no matter what their circumstances. This interest overrides any interest Donaldson possesses in ending his life through the assistance of a third person in violation of the state's penal laws.
Id. See Kevorkian v. Arnett, 939 F.Supp. 725 (C.D.Cal.1996) (there is no persuasive authority to believe that the California Supreme Court would hold contrary to Donaldson when directly presented with the issue).
In 1984, Governor Mario Cuomo convened the New York State Task Force on Life and the Law, a blue ribbon commission composed of doctors, ethicists, lawyers, religious leaders, and interested laypersons, with a mandate to develop public policy on a number of issues arising from medical advances. With respect to assisted suicide and euthanasia, the task force concluded as follows:
In this report, we unanimously recommend that New York laws prohibiting assisted suicide and euthanasia should not be changed. In essence, we propose a clear line for public policies and medical practice between forgoing medical interventions and assistance to commit suicide or euthanasia. Decisions to forgo treatment are an integral part of medical practice; the use of many treatments would be inconceivable without the ability to withhold or to stop the treatments in appropriate cases. We have identified the wishes and interests of patients as the primary guideposts for those decisions.
Assisted suicide and euthanasia would carry us into new terrain. American society has never sanctioned assisted suicide or mercy killing. We believe that the practices would be profoundly dangerous for large segments of the population, especially in light of the widespread failure of American medicine to treat pain adequately or to diagnose and treat depression in many cases. The risks would extend to all individuals who are ill. They would be most severe for those whose autonomy and well-being are already compromised by poverty, lack of access to good medical care, or membership in a stigmatized social group. The risks of legalizing assisted suicide and euthanasia for these individuals, in a health care system and society that cannot effectively protect against the impact of inadequate resources and ingrained social disadvantage, are likely to be extraordinary.
When Death is Sought: Assisted Suicide and Euthanasia in the Medical Context, vi-vii (May 1994).
The task force addressed the issue again in a supplement to the report dated April 1997 and reaffirmed this position. The task force outlined the primary risks associated with legalization as follows: (1) undiagnosed or untreated mental illness; (2) improperly managed physical symptoms; (3) insufficient attention to the suffering and fears of dying patients; (4) vulnerability of socially marginalized groups; (5) devaluation of the lives of the disabled; (6) sense of obligation; (7) patient deference to physician recommendations; (8) increasing financial incentives to limit care; (9) arbitrariness of proposed limits; and (10) impossibility of developing effective regulation. When Death is Sought: Assisted Suicide and Euthanasia in the Medical Context, 4-5 (Supplement to Report April 1997). Even those on the task force who believed that assisted suicide could be ethically appropriate in extraordinary cases concluded that legalizing it would pose serious and unsurmountable risks of mistake and abuse that would greatly outweigh any benefit that might be achieved.
One would expect persons with serious disabilities to have a vital interest in the subject of assisted suicide. The Advocacy Center for Persons With Disabilities, Inc., is a Florida nonprofit corporation organized pursuant to *102 Executive Order of the Governor which is charged with the responsibility of carrying out the federally mandated and funded protection and advocacy system for persons with disabilities in the State of Florida. In its amicus brief filed herein, the Center states:
To give someone, including a physician, the right to assist a person with a severe disability in killing himself or herself is discrimination based on a disability. It lessens the value of a person's life based on health status and subjects persons with severe physical and mental disabilities to undue pressure to which they may be especially vulnerable.
The Advocacy Center for Persons with Disability, Inc., opposes the legalization of assisted suicide, either by judicial decision negating its prohibition or by legislative enactment. If assisted suicide is permitted in Florida, Floridians will be put on the so-called slippery slope of determining the relative value of life. Floridians with severe physical and mental disabilities, who are particularly vulnerable to being devalued as burdens of society, would be at grave risk.
The American Disabled for Attendant Programs Today, Not Dead Yet, and the National Legal Center for the Medically Dependent and Disabled, Inc., three national organizations composed primarily of persons with serious disabilities, also strongly oppose assisted suicide.
We have previously refused to allow the state to prohibit affirmative medical intervention, such as the case with the right to an abortion before viability of the fetus, only because the state's interests in preventing the intervention were not compelling. In re T.W., 551 So.2d 1186 (Fla.1989) (state's interest in prohibiting abortion is compelling after fetus reaches viability). This is because, under our privacy provision, once a privacy right has been implicated, the state must establish a compelling interest to justify intruding into the privacy rights of an individual. Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985).
This Court has also rendered several prior decisions declaring in various contexts that there is a constitutional privacy right to refuse medical treatment. Those cases recognized the state's legitimate interest in (1) the preservation of life, (2) the protection of innocent third parties, (3) the prevention of suicide, and (4) the maintenance of the ethical integrity of the medical profession. However, we held that these interests were not sufficiently compelling to override the patient's right of self-determination to forego life-sustaining medical treatment.
The respondents successfully convinced the trial court that there was no meaningful difference between refusing medical treatment and obtaining a physician's assistance in committing suicide. We cannot agree that there is no distinction between the right to refuse medical treatment and the right to commit physician-assisted suicide through self-administration of a lethal dose of medication. The assistance sought here is not treatment in the traditional sense of that term. It is an affirmative act designed to cause deathno matter how well-grounded the reasoning behind it. Each of our earlier decisions involved the decision to refuse medical treatment and thus allow the natural course of events to occur. In re Dubreuil, 629 So.2d 819 (Fla.1993) (due to religious beliefs, individual wanted to refuse blood transfusion); In re Guardianship of Browning, 568 So.2d 4 (Fla.1990) (surrogate asserted right of woman who was vegetative but not terminally ill to remove nasogastric feeding tube); Public Health Trust v. Wons, 541 So.2d 96 (Fla.1989) (same facts as Dubreuil); Satz v. Perlmutter, 379 So.2d 359 (Fla.1980) (individual suffering from Lou Gehrig's disease sought to remove artificial respirator needed to keep him alive).
In the instant case, Mr. Hall seeks affirmative medical intervention that will end his life on his timetable and not in the natural course of events. There is a significant difference between these two situations. As explained by the American Medical Association:
When a life-sustaining treatment is declined, the patient dies primarily because of an underlying disease. The illness is simply allowed to take its natural course. With assisted suicide, however, death is hastened by the taking of a lethal drug or other agent. Although a physician cannot *103 force a patient to accept a treatment against the patient's will, even if the treatment is life-sustaining, it does not follow that a physician ought to provide a lethal agent to the patient. The inability of physicians to prevent death does not imply that physicians are free to help cause death.
AMA Council on Ethical and Judicial Affairs, Report I-93-8, at 2.
Measured by the criteria employed in our cases addressing the right to refuse medical treatment, three of the four recognized state interests are so compelling as to clearly outweigh Mr. Hall's desire for assistance in committing suicide.[4] First, the state has an unqualified interest in the preservation of life. Cruzan v. Director, Missouri Department of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). The opinion we adopted in Perlmutter included the caveat that suicide was not at issue because the discontinuation of life support would "merely result in [the patient's] death, if at all, from natural causes." Satz v. Perlmutter, 362 So.2d 160, 162 (Fla. 4th DCA 1978); accord Browning, 568 So.2d at 14. Although the constitutional privacy provision was not involved, in Mr. Perlmutter's case a sharp distinction was drawn between disconnecting a respirator that would result in his death from "natural causes" (i.e., the inability to breathe on his own) and an "unnatural death by means of a `death producing agent.'" Perlmutter, 362 So.2d at 162. It is the second scenario that we encounter in the instant case. Mr. Hall will not die from the complications of his illness. Rather, a physician will assist him in administering a "death producing agent" with the intent of causing certain death. The state has a compelling interest in preventing such affirmative destructive act and in preserving Mr. Hall's life.
The state also has a compelling interest in preventing suicide. As the United States Supreme Court explained in Washington:
Those who attempt suicideterminally ill or notoften suffer from depression or other mental disorders. See New York Task Force 13-22, 126-128 (more than 95% of those who commit suicide had a major psychiatric illness at the time of death; among the terminally ill, uncontrolled pain is a "risk factor" because it contributes to depression); Physician-Assisted Suicide and Euthanasia in the Netherlands: A Report of Chairman Charles T. Canady to the Subcommittee on the Constitution of the House Committee on the Judiciary, 104th Cong., 2d Sess., 10-11 (Comm. Print 1996); cf. Back, Wallace, Starts, & Pearlman, Physician-Assisted Suicide and Euthanasia in Washington State, 275 JAMA 919, 924 (1996) ("[I]ntolerable physical symptoms are not the reason most patients request physician-assisted suicide or euthanasia"). Research indicates, however, that many people who request physician-assisted suicide withdraw that request if their depression and pain are treated. H. Hendin, Seduced by Death: Doctors, Patients and the Dutch Cure 24-25 (1997) (suicidal, terminally ill patients "usually respond well to treatment for depressive illness and pain medication and are then grateful to be alive"); New York Task Force 177-178. The New York Task Force, however, expressed its concern that, because depression is difficult to diagnose, physicians and medical professionals often fail to respond adequately to seriously ill patients' needs. Id., at 175. Thus, legal physician-assisted suicide could make it more difficult for the State to protect depressed or mentally ill persons, or those who are suffering from untreated pain, from suicidal impulses.
Washington, ___ U.S. at ___, 117 S.Ct. at 2273.
Finally, the state also has a compelling interest in maintaining the integrity of the medical profession. While not all health care providers agree on the issue, the leading health care organizations are unanimous in their opposition to legalizing assisted suicide. The American Medical Association, which represents 290,000 physicians, as late as June of 1996 overwhelmingly endorsed a recommendation *104 to reaffirm the ethical ban on physician-assisted suicide. American Medical Association, Press Release, "AMA Soundly Reaffirms Policy Opposing Physician-Assisted Suicide" (June 24, 1996). The same position is endorsed by the Florida Medical Association, the Florida Society of Internal Medicine, the Florida Society of Thoracic and Cardiovascular Surgeons, the Florida Osteopathic Medical Association, the Florida Hospices, Inc., and the Florida Nurses Association. Who would have more knowledge of the dangers of legalizing assisted suicide than those intimately charged with maintaining the patient's well-being?
In addition, the Code of Medical Ethics, § 2.211, states that physician-assisted suicide is "fundamentally incompatible with the physician's role as healer, would be difficult or impossible to control, and would pose serious societal risks." Even the Hippocratic Oath itself states that a physician "will neither give a deadly drug to anybody if asked for it, nor ... make a suggestion to this effect." Physician-assisted suicide directly contradicts these ethical standards and compromises the integrity of the medical profession and the role of hospitals in caring for patients.
We do not hold that a carefully crafted statute authorizing assisted suicide would be unconstitutional. Nor do we discount the sincerity and strength of the respondents' convictions. However, we have concluded that this case should not be decided on the basis of this Court's own assessment of the weight of the competing moral arguments. By broadly construing the privacy amendment to include the right to assisted suicide, we would run the risk of arrogating to ourselves those powers to make social policy that as a constitutional matter belong only to the legislature. See art. II, § 3, Fla. Const. (separation of powers).[5]
We reverse the judgment of the trial court and uphold the constitutionality of section 782.08.
It is so ordered.
SHAW and WELLS, JJ., concur.
OVERTON and HARDING, JJ., concur with an opinion.
KOGAN, C.J., dissents with an opinion.
ANSTEAD, J., recused.
OVERTON, Justice, concurring.
I concur with the majority opinion to the extent that it finds the statute at issue to be facially constitutional. I also agree that the statute is not unconstitutional as applied under the circumstances existing in this record. I write separately to emphasize that, under the present circumstances, (1) the absolute right to assisted suicide is not, in my view, protected under our right of privacy contained in article I, section 23, of the Florida Constitution, and (2) court-approved assisted suicide, without authorization and specific legislative directives based on input from the medical and scientific community, could present more problems than it solves.
Article I, section 23, provides in pertinent part that "[e]very natural person has the right to be let alone and free from governmental intrusion into his private life." Under this provision, every individual has a right to be free from governmental intrusion into areas where an individual has a legitimate reasonable expectation of privacy. Florida Bd. Bar Examiners re Applicant, 443 So.2d 71 (Fla.1983). This right to be free from governmental intrusion is a fundamental one. Thus, once a privacy right has been implicated, the government must show a compelling interest to justify the intrusion. Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985).
I recognize that few things could be considered more private than the decision to end one's life. This does not mean, however, that an individual has an absolute right to obtain assistance from a third party to accomplish this task. In this case, the trial judge found that Mr. Hall is suffering from *105 Acquired Immune Deficiency Syndrome, that he is thirty-five years of age, that he was mentally competent at the time of trial, that he is confined to a wheelchair in obviously deteriorating health, is clearly suffering, is terminally ill, and fully comprehends his tragic predicament. The trial judge also acknowledged, however, that Mr. Hall

wishes to live, but has decided to end his suffering at the point where he will no longer feels the comfort and assurance of knowing that his agony will be followed by a period of acceptably renewed health. Contemplating his future suffering, he wants to die at the time and place of his choosing by administering a substance which will induce immediate loss of consciousness and certain death shortly thereafter. Yet, he is afraid that any attempt to take his own life at that time will be unsuccessful, and will worsen his condition. Therefore, Mr. Hall has sought consultation and assistance of a physician to provide him with a prescription for a drug that Mr. Hall would self-administer to precipitate his instant death when he reaches the point where he is convinced that his only alternative is to experience a prolonged period of useless suffering.
Throughout his testimony, Mr. Hall was mentally alert, intelligent, and exhibited a clear and vivid picture of his medical condition, its consequences, and a desire to end his life at the time he chooses, when he determines that he is not capable of functioning as a human being.
(Emphasis added.) Essentially, Mr. Hall is asking that we find the assisted suicide statute to be facially unconstitutional to provide him "carte blanche" authority to end his life at some point in the future. This is essentially the same question that was recently presented to the United States Supreme Court in Vacco v. Quill, ___ U.S.___, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997), and Washington v. Glucksberg, ___ U.S. ___, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), wherein the Court refused to recognize an open-ended constitutional right to commit suicide under either the Equal Protection Clause or the Due Process Clause. As Justice Stevens stated in his concurrence in Vacco, "the value to others of a person's life is far too precious to allow the individual to claim a constitutional entitlement to complete autonomy in making a decision to end that life." ___ U.S. at ___, 117 S.Ct. 2293, 65 U.S.L.W.at 4701 (Stevens, J., concurring in the judgment).
The State's policy of preventing suicide has been in existence for over 100 years. Advances in technology now provide efficient methods for enabling assisted suicide but also raise many new issues that must be addressed before such methods are implemented. As set forth in the majority opinion, the risks associated with assisted suicide at this time are overwhelming. Consequently, in my view, the State has clearly established under the circumstances presented that its compelling interests in preventing suicide outweigh any interests Mr. Hall may have in obtaining assistance to end his life at some point in the future.
Further, I do not believe that the voters intended that the absolute right to terminate one's life would be protected under our privacy provision. At the time our privacy provision was adopted, it was clear that a right of privacy gave individuals inherent control over decisions affecting their own bodies. See, e.g., Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (the right to an abortion); Satz v. Perlmutter, 379 So.2d 359 (Fla.1980) (the right to remove artificial lifesupport). However, distinctions had clearly been drawn between the right to the assistance of a third party in obtaining an abortion before viability of the fetus or in the removal of life-support and in the causation of an "unnatural death by means of a `death producing agent.'" Satz v. Perlmutter, 362 So.2d 160, 162 (Fla. 4th DCA 1978), approved, 379 So.2d 359 (Fla.1980). As one commentator has stated:
It's one thing for a physician to withhold or withdraw treatment that prolongs the life of the dying if the competent patient so desires. It's a very different thing for a physician to take, at the competent patient's request, affirmative steps to end life. The difference can be described as (1) allowing a terminal disease or injury to run its natural course leading to death *106 when all a physician does is to refuse to postpone the inevitable and (2) intervening in that process with a procedure that ends life then and there.
Thomas C. Marks, Jr., Physician-Assisted Suicide as a Constitutional Issue, Stetson Law., Spring 1997, at 28.
In concurring with the majority opinion, I also wish to emphasize the problems that court-approved assisted suicide would likely present, many of which have been articulated by the scientific and medical community. Recently, in a Journal of the American Medical Association article, two authors discussed this issue, criticizing the United States Circuit Court of Appeals decisions in Compassion in Dying v. Washington, 85 F.3d 1440 (9th Cir.1996), rev'd, Washington v. Glucksberg, ___ U.S. ___, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), and Quill v. Vacco, 80 F.3d 716 (2d Cir.1996), rev'd, ___ U.S. ___, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). See Ann Alpers & Bernard Lo, Does It Make Clinical Sense to Equate Terminally Ill Patients Who Require Life-Sustaining Interventions With Those Who Do Not?, 277 J.A.M.A. 1705 (1997). The authors concluded that the courts' authorization of assisted suicide, which was based on a belief that approval would enhance the care of terminally ill individuals, would actually be more likely to have the opposite effect.
This conclusion is echoed in great detail in another recent publication, which suggests that authorization of assisted suicide by the courts would actually cause more problems than it would solve for the terminally ill. See Institute of Medicine, Approaching Death: Improving Care at the End of Life, June 4, 1997. This indepth report was a project of the Institute of Medicine, which was approved by the governing board of the National Research Council of the National Academy of Sciences. The report sets out certain concepts and principles, identifies dimensions and deficiencies in the care of individuals at the end of life, and makes specific recommendations for dealing with these problems.[6] Further, although taking no official position on the issue of legally sanctioning physicianassisted suicide, the report does specifically discuss the problems in doing so, noting that the "status of being `terminally ill' has not been satisfactorily defined." Id. at 7-14. Regarding the voluntariness and competency of a patient seeking such assistance, the report states:
The criterion of voluntariness also presents problems in determining patient status and articulating boundaries (e.g., what constitutes undue influence by another party). Further, the serious question can be raised whether serious socioeconomic disadvantage nullifies voluntariness. If a desirable treatment would bankrupt a patient's family and, therefore, a patient chooses suicide, should a physician be authorized to assist? The dilemma between complicity with societal inequalities (by allowing assisted suicides) and magnification of them (by refusing assistance in suicides) is not readily resolvable.
Similarly, requiring that patients be mentally competent raises questions about what standards will be used, what threshold will be set, how fluctuating capacities will be handled, and what will be done about directions in advance. If competence *107 requires very good mental functioning, then few people known to be near death may qualify. If, however, one cannot direct suicide in advance of becoming incompetent, then people may consider pre-emptive suicide far in advance of death.
Proposals typically require that self-administered prescription drugs be authorized by a physician. If many physicians consider themselves ethically or otherwise precluded from doing so, pressure for more involvement of nonphysicians is likely to arise and, perhaps, to require new safeguards.
In sum, the proposed restrictions and intended safeguards in initiatives to legalize physician-assisted suicide are problematic: difficult to define, uncertain in implementation, or possibly creating unanticipated and unwanted consequences for those they propose to protect. Resolving uncertainties would likely be a difficult process for clinicians, and the courts almost certainly would be involved in further challenges to the implementation of assisted-suicide laws.
Id. In essence, the report concludes that numerous problems regarding the implementation of physician-assisted suicide have yet to be answered. Who makes the decision that a patient, who is depressed because of his or her physical condition, is competent to direct physician-assisted suicide? Should an interested person or family member who could financially benefit from the death of the patient be allowed to participate in the decision-making process or to influence that process? To ensure that proper decisions are made, should an independent authority, either medical (other than a treating physician) or judicial, determine the competency of the patient and approve the decision? Most importantly, what is the definition of a "terminally ill" patient?
In sum, I conclude that there is no absolute right to assisted suicide under our privacy provision. Further, I believe the statute, as applied under the facts of this case, is not unconstitutional. In reality, this Court may never be able to find an exception for an asapplied challenge to the statute until extensive evaluation of the problems involved in this issue occurs and the many difficult questions are answered. The public would be much better served if the legislature, with significant input from the medical and scientific community, would craft appropriate exceptions to the general prohibition of assisted suicide, which include suitable standards, definitions, and procedures ensuring that the use of assisted suicide would truly be used to assist only those individuals who suffer unbearable pain in the face of certain death.
HARDING, Justice, concurring.
I believe life is a sacred gift, and the decision of when it begins and how and when it ends is notin the ordinary course of eventsours to make. I recognize the emotional appeal of allowing a patient such as Mr. Hall, who is overcome with a debilitating and dehumanizing disease, to have assistance in ending his suffering. But a constitutional right must be based on more than emotional appeal. Thus, I concur with the majority's conclusion that Florida's right of privacy does not render section 782.08 unconstitutional. Majority op. at 104.
Florida's constitutional right of privacy clearly encompasses the "right to choose or refuse medical treatment." In re Guardianship of Browning, 568 So.2d 4, 11 (Fla.1990). The right of privacy encompasses the right to refuse medical treatment because "a person has a strong interest in being free from nonconsensual invasion of his [or her] bodily integrity." Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417, 424 (1977). I believe that our previous privacy decisions are animated by a recognition of that bodily integrity. See In re Dubreuil, 629 So.2d 819 (Fla.1993) (upholding woman's right to refuse on religious grounds a blood transfusion needed to save her life); Browning (allowing surrogate to assert right of woman who was vegetative but not terminally ill to remove nasogastric feeding tube); Public Health Trust v. Wons, 541 So.2d 96 (Fla.1989) (same facts as Dubreuil); Satz v. Perlmutter, 379 So.2d 359 (Fla.1980) (permitting man suffering from Lou Gehrig's disease to remove artificial respirator needed to keep him alive). In each *108 instance, we upheld the individual's right to refuse invasive medical procedures.
While I agree with the majority that there is a meaningful distinction between refusing medical treatment and obtaining a physician's assistance in committing suicide, majority op. at 102, I believe that the distinction is of such magnitude that the constitutional right of privacy is not implicated here. The fact that a "physician cannot force a patient to accept a treatment against the patient's will, even if the treatment is life-sustaining,... does not [lead to the conclusion] that a physician ought to provide a lethal agent to the patient." AMA Council on Ethical and Judicial Affairs, Report I-93-8, at 2.
In granting relief to Mr. Hall, the trial court placed the following limitations on his assisted suicide: the lethal medication must be self-administered only after both physician and patient determine that the patient is competent, imminently dying, and prepared to die. See majority op. at 100. In my mind, the need for such limitations reinforces the immense differences between refusing medical treatment and assisting in suicide. While we have established certain standards that must be followed when a physician wishes to override a patient's decision to refuse medical treatment, we have stated that a health care provider who "follows the wishes of a competent and informed patient to refuse medical treatment ... is acting appropriately and cannot be subjected to civil or criminal liability." Dubreuil, 629 So.2d at 824. In the case of physician-assisted suicide, safeguards must operate in a diametrical manner: A physician who refuses to render assistance would not be subject to any form of liability; the potential for abuse arises only where the physician is following the patient's express wish as to "medical" treatment.
I also believe that the limitations placed by the trial judge raise equal protection concerns: those patients who meet all other criteria but who are incapable of self-administering the medication are not entitled to the right. If the assistance in committing suicide is a constitutionally protected right, then how do we "draw[] a constitutional line," Browning, 568 So.2d at 12, as to who can exercise that right? How can we limit the right to those who are conscious and exclude those who are unconscious but have made a clear competent decision while conscious to exercise the right? I do not believe we can. See Browning. I also find that the other limitations pose more questions than they purportedly answer. Would a court, a doctor, or a team of doctors determine that a patient is "imminently dying"? What evidence would be sufficient to establish this criterion: affidavits of one or multiple physicians, or perhaps medical records themselves? Similarly, how would it be determined that the patient's decision is a rational one and not the product of a mental disorder? Who would determine whether the decision is motivated by economics, the patient's sense of being a burden on others, fear resulting from impending death or ongoing debility, or depression from inadequate medical care or improper pain management?
The dissent poses several hypotheticals to support its argument that a means-based test is unworkable and does not adequately define what constitutes suicide. Dissenting op. at 110-111. I believe that these hypotheticals point out the problems inherent in interpreting Florida's constitutional right of privacy so expansively as to include physician-assisted suicide. In Browning, we stated that "the right of privacy would be an empty right were it not to extend to competent and incompetent persons alike." 568 So.2d at 12. I do not relish the prospect of physicians administering lethal doses of medication to unconscious patients who have expressed a desire to exercise their "constitutional right to assisted suicide" or permitting a surrogate to make that decision, as we did in Mrs. Browning's case. Yet, if there is a constitutionally protected right to assisted suicide, then "this valuable right should not be lost because the noncognitive and vegetative condition of the patient prevents a conscious exercise of the choice." Id. (quoting John F. Kennedy Memorial Hosp., Inc. v. Bludworth, 452 So.2d 921, 924 (Fla.1984)).
In the same vein, noted constitutional scholar Yale Kamisar questions whether the right to assisted suicide could be limited in *109 any principled way to terminally ill patients. Yale Kamisar, Against Assisted Suicide Even a Very Limited Form, 72 U. Det. Mercy L.Rev. 735 (1994). He justifies the use of a "slippery slope" argument in this analysis by pointing out that because judges recognize that like cases should produce like results, it is appropriate for them to consider other fact situations which may fall within the scope of the decisions they are about to make. Thus, Professor Kamisar explains that:
[I]f, as proponents of assisted suicide maintain, there is no significant difference between the right to assisted suicide and the right to reject unwanted life-saving treatment, it is fairly clear that, once established, the right to assisted suicide would not be limited to the terminally ill. For the right of a person to reject lifesustaining medical treatment has not been so limited.

Id. at 741 (emphasis added).
The dissent recognizes a potential slippery-slope problem, but apparently believes that we can skirt the "slippery slope" by erecting safeguards to police the exercise of the right to ensure against abuse. Dissenting op. at 111. However, for all the reasons discussed above, I find that slope to be too slippery and treacherous.
I agree with the majority that "[w]e do not hold that a carefully crafted statute authorizing assisted suicide would be unconstitutional." Majority op. at 104. I believe that it is the legislature's responsibility to establish the regulations regarding such a right. Even Mr. Hall's attorney recognized at oral argument that the "legislature can and ought to engage in a regulatory process" relating to physician-assisted suicide. Through the legislative process, this issue would receive the benefit of thorough legislative research and staff analysis, partisan debate, and input from both citizens and health care professionals. On the basis of the stark record before us and the briefs of the parties and amici, I do not believe that this Court should carve out an exception to the statutory ban on assisting another in committing suicide or establish a regulatory scheme to ensure that such assistance is limited in some fashion.
KOGAN, Chief Justice, dissenting.
The notion of "dying by natural causes" contrasts neatly with the word "suicide," suggesting two categories readily distinguishable from one another. How nice it would be if today's reality were so simple. No doubt there once was a time when, for all practical purposes, the distinction was clear enough to all. But that was a time before today, before technology had crept into medicine, when dying was a far more inexorable process. Medicine now has pulled the aperture separating life and death far enough apart to expose a limbo unthinkable fifty years ago, for which the law has no easy description. Dying no longer falls into the neat categories our ancestors knew. In today's world, we demean the hard reality of terminal illness to say otherwise.
Even the evolution of the legal term "suicide" shows the change forced upon us. At common law in both England and the United States, "suicide" was any action or inaction causing one's own death even if intended "to avoid those ills which [people] had not the fortitude to endure." 4 William Blackstone, Commentaries *189. The duty imposed by this law on the dying was especially rigorous:
The life of those to whom life has become a burdenof those who are hopelessly diseased or fatally woundednay, even the lives of criminals condemned to death, are under the protection of the law, equally as lives of those who are in the full tide of life's enjoyment, and anxious to continue to live.
Blackburn v. State, 23 Ohio St. 146, 163 (1872). If this law were in effect today, there could be no question about Mr. Hall's case: He would be forced to endure his final agony. Perhaps that notion made sense in the medieval age that invented it, before the most basic processes of disease were understood. Today it reflects a cruelty we cannot take lightly.
The ability of medicine to intrude so profoundly into the act of dying has prompted a rising emphasis on the right of privacy, with its deep concern with self-determination. Since being added to the state Constitution *110 in 1980, Florida's privacy right unquestionably has subtracted certain death-inducing actions from the category of "suicide" as defined at common law. Thus, in Satz v. Perlmutter, 379 So.2d 359, 360 (Fla.1980), we upheld the decision of an individual suffering Lou Gehrig's disease to cease artificial respiration needed to keep him alive. In Public Health Trust v. Wons, 541 So.2d 96, 97-98 (Fla.1989), we upheld an individual's right to refuse a blood transfusion needed to save her life even though she had children, where refusal was based on religious beliefs. On similar facts, we reached the same conclusion In re Dubreuil, 629 So.2d 819, 827-28 (Fla. 1993), where the State failed to establish the unfitness of the other parent to assume custody of the children.[7]In re Guardianship of Browning, 568 So.2d 4, 17 (Fla.1990), we found that the right to refuse treatment could be asserted by a surrogate on behalf of a woman who was vegetative but not terminally ill, but who previously had indicated she wanted life support removed in such circumstances. All of these acts would have been suicide at common law, and the assistance provided by physicians would have been homicide. Today they are not.
Once Florida had set itself adrift from the common law definition, the problem that immediately arosethat has vexed our courts ever sinceis where to draw the new dividing line between improper "suicide" and the emerging "right of self-determination" without simultaneously authorizing involuntary euthanasia. This is no simple task. And until today, no Florida court had attempted it. The majority tries to fix the mark through scrutinizing the means by which dying occurs: Suicide thus is "active" death caused by a "death producing agent," whereas Floridians have a right to choose "passive" death through "natural causes." While language in our prior opinions can be read to support this view, I am not convinced this language can be stretched beyond the differing facts we previously faced. All of these earlier cases dealt with the refusal of medical treatment needed if life was to continue. The present case asks a far different question: How must Charles Hall die, given the fact an agonizing death is both imminent and inevitable? Principles developed in these earlier cases were not intended to, and to my mind cannot properly, resolve the very different and very troubling legal issues surrounding an unstoppable, painful death.
Indeed, the majority's "sharp" distinction between active and passive dying may cause substantial mischief. The price could be, on one hand, agony forced upon dying patients by physicians who simply do not know what else they can lawfully do, or on the other hand, a legally questionable medical hypocrisy that distorts the "active" versus "passive" distinction in an effort to be humane. Until today, for example, many people viewed Browning as letting patients make an advance refusal of nasogastric feeding and hydration effective whenever they became incompetent, no matter how incompetency came about. This was true even if a conscious patient voluntarily requested complete sedation to relieve otherwise unquenchable pain of a terminal illness. Given the majority's means-based analysis, I am at a loss to explain what now must happen in this situation, because it is here that the distinction between "active death" and "passive death" breaks down. Honoring the patient's request is very hard to distinguish from the assistance Mr. Hall requests, since both involve the "active" administration of a drug with intent to produce a more rapid death. As Florida's own living will statute indicates, physicians are not authorized "to permit any affirmative or deliberate act or omission to end life other than to permit the natural process of dying." § 765.309(1), Fla. Stat. (1995) (emphasis added). Yet, I for one have great difficulty saying that, privacy notwithstanding, the law must force Mr. Hall to suffer his agony as best he can or else must force nasogastric support on him until AIDS finally takes him away. This is little more than a retreat to the common law rule developed in Europe's Dark Ages.
One might argue that the two situations are distinguishable because in the latter the *111 drug is not actually the "death producing agent"starvation and dehydration are whereas in Mr. Hall's case the drug itself would cause death. Yet the distinction is unworkable, as demonstrated in another hypothetical: Suppose, for example, that the person asking to be permanently sedated is not terminally ill but merely suffers chronic, irreversible pain. Would it be an illegal assisted suicide if the attending physician agreed to narcotize the patient to allow starvation and dehydration? And what if the patient is an adult of sound mind who simply feels life no longer worthwhile? Can the physician also sedate and starve this one? Under a means-based test, any one of these hypotheticals must be suicide if any other is. And while I might agree that the latter two examples are questionable, I am utterly unwilling to suggest that Mr. Hall's case also might be. When his pain becomes unbearable, which one of us on this Court will be at his bedside telling him to be brave and bear it?
The issue is different here. In cases of this type, we simply cannot focus on the means by which death occurs, but on the fact that the patient at the time in question has reached the death bed. That is the fact unique in this case that was not present in the earlier cases, and it is the reason why we must use a different analysis. A meansbased test works well in the context of refusing medical treatment where life otherwise will continue. It does not work where there is no question death must occur, and must occur painfully.
To my mind, the right of privacy attaches with unusual force at the death bed. This conclusion arises in part from the privacy our society traditionally has afforded the death bed, but also from the very core of the right of privacythe right of self-determination even in the face of majoritarian disapproval. See Shaktman v. State, 553 So.2d 148, 151 (Fla.1989). What possible interest does society have in saving life when there is nothing of life to save but a final convulsion of agony? The state has no business in this arena. Terminal illness is not a portrait in blacks and whites, but unending shades of gray, involving the most profound of personal, moral, and religious questions. Many people can and do disagree over these questions, but the fact remains that it is the dying person who must resolve them in the particular case. And while we certainly cannot ignore the slippery-slope problem, we previously have established fully adequate standards to police the exercise of privacy rights in this context to ensure against abuse.[8]
Finally, I cannot ignore the majority's statement that the issues in this case must be left to the legislature. Such a statement ignores fundamental tenets of our law. Constitutional rights must be enforced by courts even against the legislature's powers, and privacy in particular must be enforced even against majoritarian sentiment. Shaktman. Indeed, the overarching purpose of the Florida Declaration of Rights along with its privacy provision is to "protect each individual within our borders from the unjust encroachment of state authorityfrom whatever official sourceinto his or her life." Traylor v. State, 596 So.2d 957, 963 (Fla.1992).
At a fundamental level, the role of the Justices and judges of Florida is to guarantee and enforce the protection afforded by these basic rights. This is at once a judge's greatest calling and heaviest burden. It is an obligation we shoulder by our oath of office, binding ourselves to enforce individual liberty even in the face of public or official opposition. To shield the liberties of the individual from encroachment is uniquely the task of courts. In that sense, we are obliged to give sanctuary against the overreaches of government.
I think we must be mindful of the history that led the American states to interpose their courts as a bulwark between majority will and the basic rights of individuals. When governed by the British Parliament and Crown, our states not only were denied representation in the general government: *112 They also were subject to a system of rule in which individual liberties came and went with passing political currents. This was possible because Great Britain had no written constitution and a judicial system readily controlled by Parliament and the sovereign. Though in earlier times the Church had offered some degree of sanctuary from the State's excesses, this protection had vanished when the English Reformation subordinated the pulpit to the Crown. The collective abuses heaped on the colonies by this political climate directly led to the American Revolution and inspired the most basic provisions of the federal and state constitutions.
British abuses were many. Property rights honored under the rule of one monarch might succumb to abrupt confiscation when an heir succeeded to the throne.[9] When government turned evil, nothing existed to stop its overreaching short of revolution. Confessions were admissible even if obtained with the rack and the screw.[10] Parliament couldand didapprove legislation that created "retroactive crimes," punishing conduct lawful at the time of its commission.[11] This often was done for simple revenge or to eliminate a hated rival. "Bills of attainder" were passed by Parliament imposing the death penalty on an individual without benefit of trial,[12] often for reasons purely political in nature. Treason, punishable by death, could consist of mere criticism of the Crown or its policies as demonstrated in the trial and execution of St. Thomas More.[13] Those "attainted" by act of Parliament or convicted of treason could suffer confiscation of all their property. Their bloodlines could be declared legally "corrupt," depriving heirs of the right to inherit.[14] In this climate, every change in the political structure of British government put the liberties of all in jeopardy.[15]
The American states would have none of this when the chance came for them to establish a new order in the New World. As noted by James Madison, one of the framers of the federal Constitution: "The sober people of America are weary of the fluctuating policy which has directed the public councils." The Federalist No. 44, at 282 (James Madison) (Clinton Rossiter ed., 1961). Their solution was to entirely remove from the political process certain kinds of issues. While the American states would be democracies in a broad sense, the authority of their democratic assemblies and executives was carefully circumscribed. This was achieved not merely by the adoption of the world's first written Constitution, but also by the subsequent addition of the Bill of Rights. Early state constitutions, though differing in many ways, both influenced and followed the federal model.
The truly remarkable, and at the time unprecedented, feature of these documents was that they defined basic rights neither the legislative nor executive branches could modify. These rights, in other words, were put beyond the ordinary political process. They could not be repealed by a mere majority *113 vote of legislators nor were they alterable through any process except constitutional amendment.
From the outset, the framers of the federal Constitution envisioned the courts as the crucial enforcers of the new limitations they placed on government. Alexander Hamilton wrote:
Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.
The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961). In Florida, our judiciary likewise is the one branch that emphatically must protect the basic rights of individuals against governmental overreaching. We guard liberty's sanctuary. It is our greatest duty to the people of Florida.
Florida's express right of privacy[16] clearly forms a major component of the protections afforded by the Declaration of Rights. Codified in the Constitution in 1980,[17] it is a fundamental right that protects the people's "legitimate expectations of privacy." Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 547 (Fla.1985). The legitimacy of such expectations are defined neither by consensus nor majoritarian sentiment, Shaktman v. State, 553 So.2d 148, 151 (Fla. 1989), but by reference to the historical development of the Anglo-American concept of "ordered liberty." Winfield, 477 So.2d at 546. Put another way, our right of privacy is both general and comprehensive. It guarantees to individuals, as against government, the broadest possible personal autonomy and freedom from disclosures of personal information that are consistent with an ordered society.[18] As we have stated:
[T]he concept of privacy encompasses much more than the right to control the disclosure of information about oneself. "Privacy" has been used interchangeably with the common understanding of the notion of "liberty," and both imply a fundamental right of self-determination subject only to the state's compelling and overriding interest. For example, privacy has been defined as an individual's "control over or the autonomy of the intimacies of personal identity," Gerety, Redefining Privacy, 12 Harv. C.R.C.L.L.Rev. 233, 281 (1977); or as a "physical and psychological zone within which an individual has the right to be free from intrusion or coercion, whether by government or by society at large." Cope, To Be Let Alone: Florida's Proposed Right of Privacy, 6 Fla. St. U.L.Rev. 671, 677 (1978).
In re Guardianship of Browning, 568 So.2d 4, 9-10 (Fla.1990). In sum, privacy protects at a minimum both a "nondisclosure interest" and an "autonomy interest."[19] *114 Judicial analysis can differ according to which interest is at stake. The difference in analysis arises to the extent that one person's privacy interest is in conflict with other basic rights possessed by separate individuals. This can occur, for example, where enforcement of one person's nondisclosure interests will undermine freedom of the press or the right to a fair trial. When such conflict exists, the Court has used a balancing test to resolve the competing constitutional claims.
Autonomy interests, by contrast, typically involve personal decisions about one's own body, home, or private life. Intrusion is inherently less justifiable to the extent the state is acting solely in its regulatory capacity. Because privacy exists precisely to protect individuals from overuse of state powers, the general interest in regulating society does not in itself prevail against a valid privacy claim, without more. Rather, the state must establish a special or compelling interest justifying the intrusion into privacy. Otherwise privacy prevails.
Our case law illustrates the distinction between nondisclosure cases and cases involving personal autonomy. We have held that the privacy amendment does not shield public records from disclosure, State v. Hume, 512 So.2d 185, 188 (Fla.1987), although it can in certain instances require quashal of a subpoena aimed at private records containing personal information. This was true, for example, where the information sought could harm third parties by identifying them as potential carriers of HIV, at least where that information was not genuinely essential to a fair trial. Rasmussen v. South Fla. Blood Serv. Inc., 500 So.2d 533, 537-38 (Fla.1987). In reaching this conclusion, the Court weighed the interest in nondisclosure against the information's relevance to the proceedings. Id.; accord Times Publishing Co. v. A.J., 626 So.2d 1314, 1315-16 (Fla.1993).
A similar balancing test has been applied in at least one case where closure of court proceedings and records was sought to preserve alleged privacy interests. Barron v. Florida Freedom Newspapers, Inc., 531 So.2d 113, 118-19 (Fla.1988). There, the Court emphasized the need to balance the privacy interest against the right to freedom of information. Id. Thus, the latter outweighed privacy interests of a Florida politician who sought closure of divorce records containing his personal medical records.[20]See id. at 120 (Barkett, J., specially concurring).
Autonomy casesof which the present controversy is oneinvolve issues of a wholly different magnitude. Generally, they ask not how to balance competing rights of individuals, but how far government in its regulatory capacity may intrude into personal decisionmaking. Wherever a legitimate expectation of privacy exists, governmental intrusion into that expectation must be based on a special or "compelling" interest. Interests are compelling if they lie at the core of government's ability to maintain order and protect the rights or well-being of others. Moreover, the means used to advance the compelling interest must be narrowly tailored through use of the least intrusive means available. Browning, 568 So.2d at 14.
We have held, for example, that privacy forbids governmental intrusion into parenting decisions, absent a compelling state interest such as a threat of harm to the child. Beagle v. Beagle, 678 So.2d 1271, 1275-76 (Fla.1996). In broad terms, the intimacies of home life, the relation of parent and child, and the decision how to structure one's private life fall within the guarantee of article I, section 23, subject only to the state's compelling interests.
Yet our cases clearly establish two other autonomy interests of great magnitude. *115 They arise from life's two most personal and private experiencesprocreation and death. In 1989, this Court noted that the voters of Florida approved the privacy amendment at a time when the concept of privacy clearly was understood to give women control of their own bodies in making reproductive decisions, within certain limits. In re T.W., 551 So.2d 1186 (Fla.1989). Likewise, we have found that health-care decision-making in generalmost especially when confronting deathis a protected interest. This is so in part because privacy gives people inherent control over decisions affecting their own bodies. E.g., Browning, 568 So.2d at 11; Public Health Trust v. Wons, 541 So.2d 96 (Fla.1989). Thus,
a competent person has the constitutional right to choose or refuse medical treatment, and that right extends to all relevant decisions concerning one's health.

Browning, 568 So.2d at 11 (emphasis added).
There is no doubt that the state has an interest in preserving life. Id. at 14. In the vast majority of cases, that interest also is compelling. None of our case law assumes otherwise. But as our cases clearly show, there are rare instances when the state's interest falls below the mark of "compelling." Indeed, the issue before us today as in our earlier cases is the
`substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long and at what cost to the individual [his][or her] life may be briefly extended.'
Browning, 568 So.2d at 14 (quoting Satz v. Perlmutter, 362 So.2d 160, 162 (Fla. 4th DCA 1978) (quoting Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 740-44, 370 N.E.2d 417, 425-26 (1977)), approved, 379 So.2d 359 (Fla.1980)). Because Mr. Hall's case involves this same critical distinction, the right of privacy clearly attaches to the decisions he is confronting with the help of his physician. I cannot in good conscience say that the state's interest is compelling, given the fact that Mr. Hall's life no longer can be saved. Here, the state is vouchsafing nothing but indignity and suffering hardly "compelling" interests. I further believe that the rule established by the majority is not merely unworkable but rests on concerns of an era that, however much we may regret it, no longer exists. A sharp dividing line once separated life from death. Today there stretches a chasm of ambiguities. Because the confrontation of these ambiguities is inherently a personal decision, I am unwilling to remove from Mr. Hall's control the way in which he confronts his own personal fate.
I respectfully dissent.
NOTES
[1] Three patient-plaintiffs originally joined in the action but two died before the trial.
[2] At common law committing suicide was a criminal offense which resulted in the forfeiture of the suicide's goods and chattels. These sanctions were later abolished in recognition of the unfairness of penalizing the suicide's family. See Washington.
[3] Iowa and Rhode Island have subsequently enacted statutes against assisted suicide. Iowa Code Ann. §§ 707A.2, 707A.3 (Supp.1997); R.I. Gen. Laws §§ 11-60-1, 11-60-3 (Supp.1996).
[4] There was no evidence introduced to demonstrate the effect of Mr. Hall's suicide upon innocent third parties.
[5] In Shands Teaching Hospital & Clinics, Inc. v. Smith, 497 So.2d 644, 646 (Fla.1986), we acknowledged that:

[O]f the three branches of government, the judiciary is the least capable of receiving public input and resolving broad public policy questions based on a societal consensus.
[6] Those recommendations are:

RECOMMENDATION 1: People with advanced, potentially fatal illnesses and those close to them should be able to expect and receive reliable, skillful, and supportive care.
RECOMMENDATION 2: Physicians, nurses, social workers, and other health professionals must commit themselves to improving care for dying patients and to using existing knowledge effectively to prevent and relieve pain and other symptoms.
RECOMMENDATION 3: Because many problems in care stem from system problems policy makers, consumer groups, and purchasers of health care should work with health care practitioners, organizations, and researchers to
a. strengthen methods for measuring the qualify of life and other outcomes of care for dying patients and those close to them;
b. develop better tools and strategies for improving the quality of care and holding health care organizations accountable for care at the end of life;
c. revise mechanisms for financing care so that they encourage rather than impede good end-of-life care and sustain rather than frustrate coordinated systems of excellent care; and
d. reform drug prescription laws, burdensome regulations, and state medical board policies and practices that impede effective use of opioids to relieve pain and suffering.
[7] Because of its alternative holdings, In re Dubreuil, 629 So.2d 819 (Fla.1993), is not entirely clear to what degree the unfitness issue would undermine the privacy interest in refusing transfusion.
[8] In Dubreuil, 629 So.2d at 823-24, we held that any physician concerned about a patient's decision must immediately provide notice to the appropriate state attorney and to interested third parties known to the physician. As a practical matter, notification must always be given in cases of this type.
[9] As a result, the Fifth and Fourteenth Amendments to the Constitution now prohibit the federal and state governments from confiscating property without due process and just compensation.
[10] Accordingly, the United States Constitution prohibits compulsory confessions. U.S. Const., amend. V.
[11] As a consequence, the United States Constitution directly prohibits these "ex post facto" laws. U.S. Const., art. I, § 9.
[12] The United States Constitution likewise prohibits Congress from passing bills of attainder. U.S. Const., art. I, § 9.
[13] For this reason, the United States Constitution expressly defines "treason" as "consist[ing] only in levying War against [the United States], or in adhering to their Enemies, giving them Aid and Comfort." U.S. Const., art. III, § 3.
[14] The United States Constitution outlaws corruption of blood. U.S. Const., art. III, § 3.
[15] History has shown many other examples of what can happen in political systems where basic rights are changeable through the ordinary political process. The commentator George Will, for example, has noted that citizens of Weimar Germany voted in huge percentages in their elections exactly because the rights to life, liberty, and property were as much at stake as anything else. The point was vividly driven home by Adolf Hitler's accession to power through the German political process. The lower voter turnout in our own elections thus may reflect the American people's confidence that their basic rights will remain intact no matter who is in power.
[16] Article I, section 23, of the Florida Constitution provides in pertinent part that "[e]very natural person has the right to be let alone and free from governmental intrusion into his private life."
[17] A right of privacy had existed prior to its codification in the Constitution, see Satz v. Perlmutter, 379 So.2d 359 (Fla.1980), though there is no doubt the amendment also broadened the right's scope. Florida also recognizes a civil form of privacy protecting individuals from unwarranted intrusions by other private individuals. Cason v. Baskin, 155 Fla. 198, 20 So.2d 243 (1944).
[18] It is important to distinguish this broader concept of "ordered liberty" from the narrower "liberty interests" protected by due process, with their different contexts and contrasting burdens of proof. Compare Department of Law Enforcement v. Real Property, 588 So.2d 957 (Fla.1991) (due process guarantees inherent fairness; government can infringe property right only upon clear and convincing evidence) with In re Guardianship of Browning, 568 So.2d 4 (Fla.1990) (privacy guarantees personal autonomy; state can justify infringements only for "compelling" interest enforced through least intrusive means).
[19] There are, of course, cases in which a claim of privacy is made for acts not genuinely private in nature. Such claims must be denied. For example, building a fence around one's property in a manner contrary to state environmental law and policy is not a private act entitled to protection under article I, section 23. Department of Community Affairs v. Moorman, 664 So.2d 930, 933 (Fla.1995), cert. denied, ___.U.S.___, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996). Privacy likewise does not authorize parents to donate the organs of their living child, thereby killing it, merely because it was born with a severe birth defect. In re T.A.C.P., 609 So.2d 588, 593 n. 9 (Fla.1992). Nor does it protect individuals from a governmental employer's decision not to hire them because they smoke cigarettes. City of North Miami v. Kurtz, 653 So.2d 1025, 1028 (Fla.1995).
[20] It deserves great stress that both Rasmussen and Barron involved private parties asserting their own personal rights about a governmental process to permit or restrain disclosures sought by other private parties. Accord Times Publishing Co., 626 So.2d at 1315. The result would not be the same where only the government's regulatory interests, not the basic rights of other persons, are the single justification for disclosure of otherwise private information.